STATE v. J. P. JONES.

(Filed 10 April, 1918.)

1. **Spirituous Liquors—Illegal Manufacture—Evidence— Trials— Questions for Jury.**

The evidence in this case that the component parts to make a complete still was found on defendant's premises, over his kitchen, with material in the progress of distilling, the odor of the liquor, etc., is held sufficient for conviction of the manufacture of liquor contrary to the statute.

2. **Spirituous Liquors—Use of Premises—Consent—Trials—Instructions.**

One who permits his premises to be used for the unlawful purpose of manufacturing spirituous liquor is a participant in the crime and as guilty of the offense as those who actually manufacture it; and where there is evidence that a still had been found on the defendant's premises, in a room over his kitchen, where spirituous liquor had been manufactured, a charge by the court that he would be guilty if he took part in the offense by giving permission that his premises be thus used, is not erroneous.

3. **Evidence—Photographs—Explanatory.**

Where there is evidence of the accuracy of a photograph, a witness may use it for the restricted purpose of illustrating his testimony to the jury, relevant to the inquiry.

CLARK, C. J., concurring with opinion.

INDICTMENT tried before *Shaw, J.,* at February Term, 1918, of SURRY.

The defendant was charged with the manufacture of liquor contrary to the statute. As there was a motion to nonsuit, it will be necessary to state some of the evidence.

U. G. Belton testified: "In consequence of information received by me, I went with E. G. Smith, revenue officer, and two policemen of the town of Mount Airy, to the home of the defendant Sampson Jones; we went into the smokehouse, a few feet in the rear of the dwelling, and there found a 50-gallon barrel about two-thirds full of still beer, two 25-gallon tubs, which apparently had had still beer in them, and something like a peck of rye malt; just outside the smokehouse door was a 50-gallon barrel about two-thirds full of sweet cider. We also found a five-gallon keg on the back porch which smelt like corn whiskey and which apparently had been recently emptied; perhaps a little of the whiskey remaining in the bottom of the keg. I was not in the house when the can and coffee pot and things were found upstairs, having gone out down the branch, away from the house, searching, but found nothing down there. When I came back these things had been found. I went in the room, saw the furnace of rock and mud, about four or five feet long and about 18 inches high, built on the floor; saw the dead coals and ashes, apparently fresh ashes, and the oil can, coffee pot, still-worm, and keg. The keg containing the still-worm was sitting near the

furnace, the worm being attached to the keg and the lower end of the
still-worm extending out through a hole near the bottom of the keg.
There was also a brass faucet in the lower part of the keg, apparently
for draining the keg. I do not remember whether there was any water
in the keg when I got there or not. The still-worm was several feet
long in a coil and is what I call a fine worm. The oil can held about
five gallons; the opening at the top was enlarged and had a collar about
it; the coffee pot, which held about three quarts, had been split up
about the spout and lapped over so that it fitted the opening in this still.
I was four years a brandy gauger and visited, on an average, fifty or
more brandy distilleries a year. I have also seen in operation a great
many whiskey distilleries and know the outfit and ingredients necessary
for the making of whiskey and brandy. Still beer is the fermented meal
or malt out of which whiskey is made by distillation; low wine is a
whiskey, less than proof, which runs out through a worm at the end of
the 'doubling,' and which in the ordinary process is poured into the next
'run' to make it proof liquor. The necessary outfit for making whiskey
is a still, a still cap, a still-worm, and a cooling tub. The parapherna-
lia found at Sampson Jones', when connected up, made a complete distil-
lery outfit to manufacture either whiskey or brandy, and I should say
that the outfit there found would make from five to seven gallons of
liquor in a day."

M. F. Patterson testified: "I was at J. P. Jones' with Sheriff Belton,
Deputy Sheriff Davis, and Policeman Monday and Revenue Officer E. G.
Smith; we went there in the afternoon, some time prior to October Term
of court; we found in the smokehouse, a few yards in the rear of the
dwelling, a barrel about three-fourths full of still beer, and two empty
25-gallon receptacles which appeared to have had still beer in them, and
some rye malt; just outside the smokehouse we found a 50-gallon barrel,
about three-fourths full of sweet cider. While the others were making
the search about the premises, E. G. Smith and myself went in the dwell-
ing-house, which was open, and searched the rooms downstairs and found
nothing, except the ordinary furnishings. We went upstairs, accompa-
nied by a son of J. P. Jones, a boy of about fourteen or fifteen years of
age, and searched the two front rooms and found, behind a trunk, two
quarts in bottles of low wine; when we came to the door of the room
over the kitchen it was locked, and we asked the boy to let us into this
room, but he hesitated and said he would rather not go in there until his
father came, and that he was on the upper place, about a mile in Vir-
ginia. He then took the key, which was hanging somewhere about the
door, and unlocked it. We found in this room over the kitchen a fur-
nace of rock and mud, or mortar, built on the floor near the chimney,
about four or five feet long, and from fourteen to eighteen inches high;

by the side of the furnace was a wooden keg with a still-worm in it, and there was also on the floor a tin can holding about four gallons, which looked like an oil can, and a coffee pot with a copper arm or spout about 18 inches long. We took the five-gallon can and set it on top of the furnace and it fitted exactly into the opening surrounded by a rim of mortar; the bottom of the can was black and the sides of it were smoked black, and there was what appeared to be baked meal around the top of the can. The opening in the top of the five-gallon can was not so large as the opening at the top of the coffee pot, about three-quart coffee pot; the upper part of the coffee pot had been split and lapped over, so lapped that it fitted exactly into the top of the can; the end of the arm or spout extending from the coffee pot fitted exactly into the still-worm in the tub or keg. They were not connected, however, but lying in different parts of the room. The defendant Jones was not at home; his son was there clerking in the store. He went in the house with us and told us his father was at work on the farm. The house had three rooms upstairs and three rooms downstairs. There were cans packed in the room over the kitchen in which we found the furnace and other articles of furniture. We found two bottles of backings or wines in a bedroom behind a trunk, not the room in which we found the furnace and other articles mentioned. Jones lives on the sand-clay road about four miles from Mount Airy, in a thickly populated neighborhood."

There was other testimony of a like kind.

The defendant was convicted and appealed from the judgment of the court.

*Attorney-General Manning and Assistant Attorney-General Sykes for the State.*

*Folger, Jackson & Folger for defendant.*

WALKER, J., after stating the case: There was ample evidence to support the verdict, and the motion to nonsuit was properly overruled. The evidence tended to show that defendant had been engaged in the business of manufacturing liquor. He had on his premises and in his residence all the component parts of a perfect apparatus for distilling liquor, and if others assisted in the process of manufacturing, there was also evidence that the defendant not only permitted the illegal business to be done in his house, but actually furnished the still and the place for using it, and this would make him a participant in the crime.

The charge of the court that if the defendant took part in the offense by giving his permission to the use of his premises for the illegal purpose, he would be guilty, is clearly sustained by the case of *S. v. Denton,* 154 N. C., 641, where this Court held, as shown by the headnotes,

as follows: "1. If the jury should be satisfied from the evidence that H. owned the whiskey and brought it in a basket to defendant's home for the purpose of selling it there, and sold a pint to one D. in defendant's presence and with his knowledge, the defendant would be guilty of aiding and abetting the sale; and that is in misdemeanors all aiders and abettors are principals, defendant would be guilty as a principal in the unlawful sale. 2. One is guilty of an unlawful sale of spirituous liquor as a principal when he allows the use of his home in order to more secretly effect the sale there; and evidence tending to show that this was done and the price paid while at defendant's home in a room wherein he was lying on a lounge, though without evidence of his receiving a part of the price paid, is sufficient for his conviction as a principal in aiding and abetting the unlawful act," citing *Commonwealth v. Hayes,* 167 Mass., 176, as deciding that one may be convicted for the unlawful sale of or keeping for sale of, intoxicating liquors, if the jury find "that the premises were kept and maintained by him, and that any part thereof was, with defendant's consent, used for the illegal sale or keeping of spirituous liquors."

And this Court added in *S. v. Denton, supra:* "If the defendant knowingly permitted Hodge to use his home for the illicit sale of whiskey on one occasion, he is an aider and abettor on that occasion; and it is as much a violation of law as if he habitually permitted it."

That case was decided by a divided Court (two of the justices dissenting), but, even under the view held by the dissenting justices, the charge here could be sustained. This case is much stronger to show defendant's actual participation, as an aider and abettor, than the *Denton case,* for under the instruction of the Court the jury must have found that defendant did more than assent tacitly to the manufacture of liquor, and that he "aided and assisted" by contributing the use of his premises to the unlawful purpose. He is just as guilty, under the statute (Public Laws of 1917, ch. 157), as if he had furnished the still or the corn and apples, or the coal and wood to make the fire, or any other material used in the manufacture of the liquor.

The mere knowledge of the use of premises by a distiller and consent thereto of one who holds a mortgage on the same is made a ground of forfeiture by him of his interest under the act of Congress. *U. S. v. Stowell,* 133 U. S., 1; *Glenn v. Winstead,* 116 N. C., 454.

The exceptions as to the use of the photograph for the purpose of allowing one of the witnesses to illustrate or explain his testimony is not well taken. The witness was endeavoring to show how the parts of the distillery which were found in the house might be assembled so as to make a complete apparatus for manufacturing liquor. He could use a diagram for the purpose, and why not a photograph? The trial judge

excluded it for any other purpose, and distinctly charged the jury to disregard it, except for the indicated purpose and not to use it as substantive testimony. The witness M. F. Patterson testified that "it was a correct picture of the implements found in the defendant's house."

Photographs have been admitted in evidence with the sanction of the courts in similar cases. *Butler v. State,* 142 Ga., 286; *Wade v. R. R.,* 89 S. C., 280; *Griffith v. Coal Co.,* 84 S. E., 621; *Spencer v. Looney,* 116 Va., 767; *Prok v. R. R.,* 75 W. Va., 697; *Napier v. Little,* 38 L. R. A. (N. S.), 91 (Anno. Cases, 1913 A, 1013); *Shaw v. State,* 83 Ga., 92; and in *S. v. O'Reilly,* 126 Mo., 597, where it is said: "It has always been permissible to use diagrams in the trial of causes, both civil and criminal, and especially in the latter class to use diagrams, if shown to be correct, to illustrate the position of persons and places and to better enable the witnesses to properly locate them. If, then, a diagram may be used for such a purpose, we can see no good reason why a photograph may not be, by which is presented to view everything within the range of the camera at the time the photograph was taken."

We have permitted photographs to be used, instead of diagrams, under circumstances making the latter competent, when they were shown to have been correctly taken. *Hampton v. R. R.,* 120 N. C., 534; *Davis v. R. R.,* 136 N. C., 116; *Pickett v. R. R.,* 153 N. C., 148; *Hoyle v. Hickory,* 167 N. C., 619. As we said in the *Hickory case,* it might be impossible to illustrate the situation, or to give the jury a correct idea of it in any other way. If the correctness of the picture is shown, we do not see why it should be less competent than a diagram, or a drawing made by the witness for purposes of illustration at the time he testified.

No error.

CLARK, C. J., concurring: When a witness described the still and appurtenances it was not the article itself that was presented to the jury, but simply a representation, more or less vivid, and more or less accurate, depending upon the witness. When the still and attachments were presented by a photograph, this was really more accurate and better calculated to convey to the minds of the jury the appearance of the still and fixtures than the oral description. It is true that a photograph can be so taken as to convey a false impression. But that is true also as to oral testimony. In both cases, there is the safeguard of cross-examination of witnesses and of other testimony. In describing action or movement, as an assault and battery, a kinematoscope, if it could be had, would be more useful than the language of any witness, for on such occasions witnesses often honestly disagree in their account of what they saw.

When there is an agreement reduced to writing, the writing is the best and sometimes the only proof allowed of what was said. Then there are occasions in which the jury has been allowed to visit the scene of the crime, as being more accurate and useful than the testimony of witnesses. *Jenkins v. R. R.*, 110 N. C., 441; *S. v. Gooch*, 94 N. C., 987; *Hampton v. R. R.*, 120 N. C., 534; *S. v. Perry*, 121 N. C., 535; *Brown v. R. R.*, 165 N. C., 396; *Long v. Byrd*, 169 N. C., 658. In short, the courts resort to all these forms of evidence, the object being to elicit the truth.

When a photograph was first offered in our Court it was excluded (*Hampton v. R. R.*, 120 N. C., 537) by the majority opinion, but the dissenting opinion quoted 31 American Law, 268, that its "admission was opposed upon the principle that this kind of evidence was unknown to the learned lawyers of the Saxon Heptarch, and therefore not evidence." Ever since that opinion, however, the Court has followed the now uniform ruling of other courts that photographs are competent as evidence, subject, however, to the usual tests of truth.

A trial is a search for truth, and no court will exclude testimony that will be an aid to that end, whether it is oral testimony, a photograph, a sketch or a map made during the trial, or a map made under the order of the court, or a writing, or an X-ray, or any other process or means, subject to the rule that the best evidence which the nature of the case will admit of must be used and subject to cross-examination and opposing evidence in open court.