## STATE v. LESTER STANLEY.

(Filed 24 September, 1947.)

**1. Homicide § 25—**

The evidence tended to show that defendant killed his wife by making two separate slashes of a razor across her throat, which overlapped and cut her throat from ear to ear to a depth which almost decapitated her. *Held:* The brutal and vicious manner of the slaying is sufficient to support an inference of premeditation and deliberation, and defendant's motion to nonsuit on the capital felony was properly overruled.

**2. Constitutional Law §§ 32, 34—**

A person accused of crime is entitled to information as to the nature of the crime of which he is accused and has the right to confront his

accusers; the first of these is satisfied by his arraignment, and the second by his confrontation and examination of the witnesses upon the trial.

**3. Same: Indictment § 6—**

In capital cases the indictment must be returned in open court by the grand jury in a body or by a majority of them, G. S., 15-141, but the indictment and its return are no part of the trial and therefore defendant's constitutional right of confrontation is not infringed by his absence when the indictment is returned.

**4. Criminal Law § 38d—**

Where a witness testifies that photographs accurately represented the scene, the use of the photographs to illustrate the witness' testimony is competent, and objection thereto on the ground that the witness did not make the photographs is untenable.

**5. Criminal Law § 31a—**

A physician, qualified as an expert, testified from his examination of the body that deceased was in a prone position when the fatal injuries were inflicted because, if the deceased had been standing, the quantity and pressure of the blood which would have gushed forth from the severed arteries of the neck would have sprayed a larger area with blood. *Held:* The reasons assigned by the witness for his conclusion bring the conclusion well within the rule of expert opinion testimony.

**6. Same—**

Testimony of an embalmer describing the wounds he found on the body in the course of preparing the body for burial is testimony as to an observed fact not requiring expert testimony.

**7. Constitutional Law § 33: Jury § 5b—**

Upon emergency arising after afternoon adjournment of the court and after defendant's counsel had left and was too far away to be available, the judge called the court back in session and in open court, and in defendant's presence, substituted the 13th juror in the exercise of his discretion, G. S., 9-21. *Held:* There being no suggestion of any unusual reason demanding the presence of defendant's counsel, it cannot be held that defendant was prejudiced or deprived of any fundamental right by the action of the court.

DEFENDANT's appeal from *Burgwyn, Special Judge,* at April Special Criminal Term, 1947, of EDGECOMBE.

This defendant, Lester Stanley, was tried upon an indictment charging him with the murder of his wife, Shirley Stanley; was convicted of murder in the first degree, sentenced to death, and appealed. Parts of the record and evidence sufficient to an understanding of the points discussed in the opinion are summarized in this statement.

At the opening of the trial the defendant moved to quash the bill of indictment because he was not present in court when it was returned and read. The motion was overruled and defendant excepted.

STATE *v.* STANLEY.

The defendant, Lester Stanley, and Shirley Ruffin were married in June, 1944, lived together about three weeks, when defendant was drafted for service in the war. While he was gone a daughter was born to them. Stanley returned in September, 1946, and thereafter lived with his wife and child in the home of Robert Ruffin, his father-in-law, occupying a bedroom next to that of Ruffin and his wife. Ruffin was a brick mason, and Stanley was employed by him and working with him on 10 March, 1947, the day on which the death of Shirley Stanley occurred, on a job four or five blocks from the home, and about five minutes walk. On that morning, when Ruffin got ready to go on the job, Stanley insisted that William Rollins, another worker who ordinarily pushed the wheelbarrow containing the bricks, should go in the car with Ruffin and that he should come along with the wheelbarrow after them. As his wife's mother had left earlier for the laundry where she was working he was thus left alone with his wife and infant at the home. A neighbor woman came in and engaged Shirley in conversation for a short time and left.

Stanley arrived on the job at the Babcock house about 45 minutes after Ruffin and Rollins had gone to work, began mixing the cement, and remained until they were called to the Ruffin home by the police, reaching there about 11:30 o'clock.

Meantime two women had come to the Ruffin house, found the front door locked from the inside, and after repeated knocks and calls, went to the back door where they effected an entrance. Terrified at what they saw through the door of a bedroom, one of them took the baby outdoors and the other called Shirley's mother and the police. The latter, on arrival, as stated, called Ruffin.

Shirley Stanley was found in the bedroom of Ruffin and his wife, lying on the floor beside the bed, in a grotesque position, one pajama leg torn off and lying on the bed, with her throat cut from ear to ear, the blood in a pool around her head. Her clothing was up around her waist and toward her neck, her legs drawn up and spread open. No one was allowed to enter, but the body could be seen from the door. Stanley said, "Somebody has killed my wife. I hope I don't find them before you all do!"

Spots observed on defendant's overalls which had the appearance of blood led to his arrest and imprisonment. After many denials and conflicting statements he finally made a statement, which in the main, he later confirmed by his own testimony on the trial, in which he gave his version of the circumstances leading to and accompanying the death of his wife and his own conduct and part in the final scene and afterward, substantially as follows:

With much repetition he told the officers that he had trouble with his wife the night before and became angry with her because she declined to

have marital relations with him, and sat up awhile, smoking. He chose the next morning, said he, to "make up" with her. She repulsed his advances, told him to get out of the house, that she no longer cared for him, and didn't want to see him again. During the course of the argument she left the room and returned with the razor. In pulling the razor away from her, said he, her hand was cut. During the struggle he had his arms around his wife, her back to him, with the razor in his hands, and as he shoved her away from him her throat was accidentally cut. That he was scared, went out the back way, threw the razor under the house, washed the blood off his hands in a bucket of water, and got some on a handkerchief. He buried the handkerchief, he said, near the place where he was working; later he voluntarily went with the officers, showed them the place, and it was unearthed.

The blood on several garments worn by defendant at the time of the death was analyzed by experts and proved to be the same type as that of deceased.

Photographs of the rooms, and the body as found, which the witness testified were accurate representations, were, over defendant's objection, permitted to be shown the jury, with the caution that they were not substantive evidence, but could be considered only as illustrating the testimony. Defendant excepted.

Dr. Norfleet, qualified as an expert, testified that deceased had two cuts upon the neck on both sides, lapping from both sides, which severed major arteries. Based upon his examination of the body and its surroundings he gave it as his opinion that the deceased was lying on the floor when she received these wounds. To this defendant objected and excepted. The witness gave as his reasons that if she had been standing the severance of the major blood vessel in the neck would have caused the blood to gush or spurt out in quantities under the pressure and spray a greater area than he found to be the case, and particularly the bed and furniture immediately near, and he found no such evidence of that condition. There was blood on the floor, for quite a distance, but none on the upper part of the furniture, and none on the bed, which was right next to the body, except at a low level. A major blood vessel, however, was cut to produce the amount of blood he saw on the floor. If a person's throat was cut, and a major blood vessel severed, the blood would gush out before he could fall to the floor, and in this instance would have shown on the furniture or bedspread.

William Parker, who owns a funeral home in Tarboro and embalmed the body, after qualifying as an expert embalmer, especially as to the human circulatory system, testified that in the course of preparing the body for burial he examined the wounds inflicted upon the neck and throat. The neck was cut practically all the way from the lobe of one

ear to that of the other, in two incisions, severing both jugular veins. The esophagus was cut in two, and a "nick" was made in the neckbone. To this evidence defendant excepted.

Upon the conclusion of evidence, defendant demurred to the evidence and moved for judgment as of nonsuit, which was denied, and defendant excepted. Defendant also moved to nonsuit on the charge of first degree murder, which was refused, and defendant excepted.

At the conclusion of the evidence and before argument began the court excused one of the jurors for cause, and substituted for him the "thirteenth" juror, who had been qualified as the statute requires, and had sat with the jury throughout the trial. The prisoner was present in court but his counsel had left the court after adjournment and was not present or available. Counsel was permitted to file objection and exception.

The verdict was murder in the first degree. Defendant moved to set aside the verdict for errors committed on the trial, which was denied, and defendant excepted. From the ensuing sentence of death, defendant, having objected and excepted, appealed, assigning errors.

*Attorney-General McMullan and Assistant Attorneys-General Bruton, Rhodes, and Moody for the State.*

*Cooley & May for defendant, appellant.*

SEAWELL, J. In view of the voluminous record and the number of exceptions taken upon the trial it is necessary to confine discussion to those objections which counsel for appellant have urged upon us as being of a more serious nature. However, it must be understood that those exceptions not discussed here or noted in the foregoing statement have received careful attention and have not been considered of sufficient merit to affect the result of the trial. *In limine* it is proper to say that the demurrers to the evidence, including the motion to nonsuit the graver charge of first degree murder, were properly overruled. The evidence of the guilt of defendant is plenary; and there are several phases of the evidence sufficient to give rise to the inference of deliberation and premeditation. If we pass over the inference that the defendant nursed his grievance of the night before and vengefully renewed it the morning after, and also inference that he deliberately planned the opportunity and set the stage for the tragedy, all of which point to deliberation and premeditation, the vicious, ferocious, and brutal manner of the slaying,— by two slashes of the razor which almost decapitated the victim,—engenders an inference of premeditation and deliberation distinct from the presumption of second degree murder by the intentional use of a deadly weapon in the killing and not merged therein. *S. v. Artis, ante,* 371;

*S. v. Taylor,* 213 N. C., 521, 523, 196 S. E., 832; *S. v. Hunt,* 134 N. C., 684, 689, 47 S. E., 49; *S. v. Bynum,* 175 N. C., 777, 783, 95 S. E., 101. From *S. v. Bynum, supra,* we quote:

> "If this evidence satisfied the jury that the prisoner committed the homicide, the attendant circumstances of the killing by cutting her throat from ear to ear, beating up her head, and breaking her nose with a club, the wiping of the knife-blade in the grass and the hands with buds and leaves, if believed, was evidence from which the jury could infer that the killing was deliberate and purposeful, and not a sudden access of rage and such premeditation, if only for a moment, is sufficient to make it murder in the first degree."

The defendant moved to quash the indictment because of the fact that he was not present when it was returned by the grand jury in a body and read in open court.

Relative to indictment and trial there are two things guaranteed by the Constitution to one accused of crime; information as to the nature of the crime of which he is accused, and confrontation of his accusers. One of these requirements is satisfied by his arraignment, and if by plea of not guilty he puts himself upon his country the ensuing trial by jury in which he may confront and examine the witnesses, satisfies the other. The exception seems to point to one or the other of these rights, neither of which was denied him. In a capital case the indictment is still required to be returned into open court by the grand jury in a body, or a majority of them. G. S., 15-141. In other cases it may be returned by the foreman. It may be assumed that the practice has been preserved in the case of capital felonies as an additional guaranty that the requisites to its validity have been duly observed.

The indictment and its return are no part of the trial. The fallacy of the argument that it was in any way necessary that the defendant be present at once appears when we understand that the indictment is often found before the accused is even apprehended. It is not the practice to have defendant present although he may be in custody.

Other challenges to the validity of the trial which merit further discussion are: Objection to the use of photographs of the body and the scene of the tragedy; expert opinion evidence as to whether the woman was standing or recumbent when the wounds were inflicted upon her; testimony of the embalmer as to the nature and extent of the wounds found upon the body; and exception to the order substituting the 13th juror as one of the original twelve in the absence of counsel. We discuss these in that order.

The witness testifying said that the photographs accurately represented the position and condition of the body when found and its environment.

They were then permitted to be used to illustrate the testimony, with the caution that they were not substantive evidence. The objection here is based on the fact that the photographs were not made by the person testifying.

In this, as in most other jurisdictions, it is not necessary that a photograph used only to illustrate the evidence be made by the witness testifying "providing he can testify to its adequacy as a representation of the subject it purports to illustrate." Stansbury, North Carolina Evidence, Sec. 34; *Bane v. R. R.,* 171 N. C., 328, 88 S. E., 477; *Roane v. McCoy,* 182 N. C., 727, 109 S. E., 842; *Gates v. McCormick,* 176 N. C., 640, 97 S. E., 626; *Hagaman v. Bernhardt,* 162 N. C., 381, 78 S. E., 209.

Reference to the reasons given by Dr. Norfleet (see statement, *supra*) for his conclusion that Shirley Stanley was lying down when the wounds were inflicted upon her convincingly bring the subject within the rule of expert opinion, based upon professional knowledge of the behavior of the human body, its organs and functions, particularly the blood circulatory system under invasion by wounds such as were found. Similar expert testimony has been approved in *George v. R. R.,* 215 N. C., 773, 3 S. E. (2d), 286. Expert medical opinion has been often resorted to, to show the position of the body when it received a lethal wound. Admission of the evidence of the embalmer presents no prejudicial error. The statement of the embalmer was to an observed fact which did not require expert testimony.

The objection to the substitution of the alternate or 13th juror as a member of the panel is confined to the fact that it was done in the absence of defendant's counsel. The substitution was made in open court; but it had recessed for the afternoon and was called back in session. The defendant was present.

The record shows that the emergency, or condition requiring the substitution, arose after defendant's counsel had left the court upon the afternoon adjournment and was too far away to be available. No fault is attached to the attorney because of his absence; the question is whether any constitutional right of the defendant was invaded by the action of the court in the absence of counsel; or that it was attended with prejudicial error.

Rule 27 of Superior Court Practice relieves the court from sending for counsel when the case is called in a regular session. The corollary is that the court violates no duty by proceeding without counsel when it does not appear that the particular matter, because of some *unusual reason,* demands his presence. *S. v. Denton,* 154 N. C., 641, 70 S. E., 839. Perhaps an "unusual reason" might be afterward discovered in some prejudicial action by the judge which might have been resisted by counsel if present. In the instant case, however, there is no such sug-

gestion. In fact the 13th juror had been passed by both the solicitor and the counsel for defendant and was qualified to take his seat when the trial judge, in the exercise of his discretion conferred by the statute, G. S., 9-21, found it to be necessary. Under these circumstances we are unable to see that the defendant suffered deprivation of any fundamental right by action in the absence of counsel or that he was prejudiced in any way in the trial of his cause. *S. v. Dalton,* 206 N. C., 507, 174 S. E., 422; *S. v. Broom,* 222 N. C., 324, 22 S. E. (2d), 926.

As stated, we have carefully examined the record, considering all of the exceptions to the trial, and we find

No error.