## STATE v. ANNIE LAURIE GARDNER.

(Filed 17 March, 1948.)

**1. Criminal Law § 38d—**

Photographs are not competent as substantive evidence but may be used by a witness only for the restricted purpose of explaining or illustrating his testimony when description in words of the scene, object or person represented would be competent.

**2. Same—**

The accuracy of a photograph as a true representation of the scene, object or person it purports to portray must be shown by extrinsic evidence, but it is not required that this be established by the photographer, it being sufficient if it is established by any witness familiar with the scene, object or person portrayed.

**3. Same—**

Whether there is sufficient extrinsic evidence to establish the accuracy of a photograph is a preliminary question of fact for the trial judge.

**4. Same—**

The fact that an authenticated photograph competent for the purpose of illustrating or explaining the witness' testimony is gory or gruesome or may tend to arouse prejudice does not render the photograph incompetent.

**5. Same: Homicide § 22—**

The State's evidence tended to show that defendant stabbed deceased in the neck with a knife, inflicting mortal injury. Defendant pleaded self-defense. *Held:* It was competent for witnesses to testify as to the bloody condition of the room after the assault and as to the nature of deceased's wound as tending to show that defendant used excessive force and that the attack was vicious, and therefore photographs of the room as it appeared immediately after the attack and photographs of the body of deceased as it had been turned over where deceased fell after the attack, are competent

for the purpose of explaining and illustrating the witnesses' testimony in these respects.

**6. Same—**

The fact that a photograph showing the wound described by the doctor was taken in the morgue after the body had been cleansed, does not of itself render the photograph incompetent for use in illustrating the testimony of the doctor.

**7. Criminal Law §§ 50d, 81b—**

The record disclosed that a State's witness testified on cross-examination that he saw defendant "make a run and her hand go that way." The court interposed, "What do you mean by 'make a run'? Give a step like that and hit him?" A. "He got up, she took a step and hit him." *Held:* The record discloses only the words of the court, and does not affirmatively disclose any demonstrative action by the court constituting an expression or intimation of opinion on the evidence forbidden by law, and defendant's exception thereto cannot be sustained.

**8. Criminal Law § 81c (3)—**

The State's witness testified that after the homicide defendant said, "she would have cut his damned head off if they had let her alone,—that she didn't care," and then, in response to a question by the solicitor as to whether defendant expressed any remorse answered "Not any." *Held:* Conceding that defendant's objection to the question as to whether defendant expressed remorse should have been sustained, the testimony in regard thereto, when considered with the testimony immediately preceding, was not of sufficient prejudicial import to warrant a new trial.

**9. Homicide § 22—**

Where defendant pleads self-defense, testimony as to the bloody condition of the room immediately after defendant's fatal attack on deceased is competent as bearing upon the character of the wound inflicted.

**10. Criminal Law § 81c (3)—**

Exception to the admission of evidence cannot be sustained when other evidence of like import is admitted without objection.

APPEAL by defendant from *Phillips, J.,* at November Term, 1947, of BUNCOMBE.

Criminal prosecution upon indictment charging that defendant "late of Buncombe County . . . with force and arms, at and in said county, unlawfully, willfully and feloniously, of her deliberate and premeditated malice aforethought, did kill and murder one Nathaniel Barnard, contrary to the form of the statute," etc.

The solicitor announced in open court, upon the call of the case for trial, that the State elected not to try defendant on the charge of murder in the first degree, but for murder in the second degree or manslaughter as the evidence and the law might justify.

Defendant pleaded not guilty, and defended upon the ground of self-defense.

On the trial in Superior Court the State offered evidence tending to show these facts: That Nathaniel Barnard, called Nate Barnard, who was tall and weighed about 230 pounds, came to his death on the night of 25 October, 1947, as result of stab wound in his neck inflicted by a knife in the hands of defendant, Annie Laurie Gardner, at the home of James Roberts, her brother-in-law, at Dula Springs in Buncombe County, North Carolina; that the Roberts home is a one-room house and in it were a table, a stove, three beds and three chairs; that defendant and her sister and Nate Barnard came to the Roberts home about eight o'clock in the evening; that defendant and Nate, who had been "going together" about two years, were "arguing" when they got there; that Nate sat down on the bed and they "got to arguing and talking and got into a fight there"; that defendant hollered out "He hit me"; that James Roberts then took Nate "out of doors," but he later came back in the house; that defendant didn't say anything to him, but she was "just a-crying" then; that Nate was sitting on the bed, and defendant was behind her sister and "kept sidling around," and Nate said something and got up, and she said, "I am getting tired of your foolishness; you have run over me about long enough," and she made "a run" and hit Nate, and blood spurted from his neck, and he staggered toward the door and went down the hill and fell about seventy-five feet from the house and died there; and that blood was "all in the house."

The State offered other evidence in ampliation of the above narrative of events leading up to and culminating in the homicide. It is unnecessary for purpose of this appeal to give more detailed recital. Such of the evidence as is pertinent to presentation of assignments of error follows:

The record shows that for the purpose of illustrating testimony of certain witnesses, and over objections and exceptions duly made and taken by defendant, the State offered three photographs, to wit: (1) Exhibit S-1, identified by the State's witness James Roberts as fairly representing the house and the condition of it after deceased "had got up and gone out," and also identified by deputy sheriff Burleson, witness for the State, as fairly representing the condition of the house when he arrived there that night,—after the homicide occurred. The witness Roberts introduced by the State had testified without objection of defendant that he saw blood spurting from the neck of Nate, and that "there was blood all in the house." And the deputy sheriff had testified, over objection of defendant, that when he went there, "the house was as bloody a place as you could see. You had to walk in the blood." And later in the course of the trial Dr. P. R. Terry, also witness for the State.

testified without objection by defendant, that when he went into the house that night: "I found the floor of the house covered with blood, blood on the walls and blood on the door coming out of the house, and going down to where the body was lying—tracks of blood all the way down there." There is no evidence as to who took the photograph.

(2) Exhibit S-2, identified by deputy sheriff Burleson, State's witness, as fairly representing the circumstances under which he found the deceased when he reached the scene, except that deceased was lying on his face,—the picture being made after the body had been turned over on its back, and also identified by Dr. Terry as fairly representing the body and its surroundings as he found it when he arrived there. The deputy sheriff had testified that on the night of the homicide he had found deceased lying on his face, that the body was turned over—he believed by the coroner, and that this was about 75 feet from the Roberts house. And Dr. Terry then testified that when he got there he found "a Negro man lying on his back by the side of the path . . . 75 to 100 feet below the house"; that he had a wound in his right neck; and that "he was dead when I arrived there." There is no evidence as to who took the photograph.

(3) Exhibit S-4, identified by Dr. Terry, State's witness, as fairly representing the body of the deceased and the wound he had described. The doctor had testified that in his opinion Nathaniel Barnard died from hemorrhage from the wound in the neck. Quoting him, "I have a picture that shows how large a wound better than I can describe. It was in the right neck . . . a stabbing and cutting wound. What I mean, stab of the knife and she pulled it out and cut the wound and made it larger, just above the right clavicle. . . . This knife wound went in and severed the subclavian vein or artery . . . and it punctured the inner lobe of the lung . . . went in there two or three inches . . . a wound like that with a terrible hemorrhage like that the man couldn't live over 4 or 5 minutes." The State seems to concede that this photograph was taken in a morgue,—showing a wound in the right neck. There is no evidence as to who took it.

When the first of the photographs was offered by the State, the trial judge gave this instruction to the jury: "You will not consider the photograph as substantive evidence,—it is not competent for that purpose. It is only competent, and the court limits the evidence in the way of a photograph to illustrating the testimony of the witness, and it is a question for you as to whether or not it does illustrate his testimony, and you will receive it and consider the photograph in no other way other than as tending to illustrate the testimony of the witness, and not as substantive evidence." Defendant again excepts.

Like instructions were given when each of the other two photographs was offered by the State, and in each instance defendant excepted.

The record also shows that during the cross-examination of James Roberts, witness for the State, he had stated that defendant said, "You have run over me long enough; I have took enough of your foolishness" and that then he "saw her make a run and her hand go that way," the court interposed: "What do you mean by 'make a run'? Give a step like that and hit him?" Defendant excepts. A. "He got up, she took a step and hit him." Motion to strike. Denied. Defendant excepts.

The record further shows that in the course of the direct examination of deputy sheriff Burleson, after he had related a conversation with defendant later in the night of the homicide, he testified: "She said she would have cut his damned head off if they had let her alone,—that she didn't care." Then the solicitor asked the witness this question: "Did she express any remorse for having cut him?", to which the witness answered "Not any."

Defendant's objection to the question, aptly made, was overruled, and her motion to strike the answer was denied. She excepted to each ruling.

And the record shows exception by defendant to the testimony of deputy sheriff Burleson that "the house was just as bloody a place as you could see. You had to walk in the blood."

Defendant, having reserved exception to denial of her motion, made when the State first rested, for judgment as of nonsuit on the charge of murder in the second degree, offered evidence tending to show that she is of good character, and she, as witness in her own behalf, gave her version of events leading up to and culminating in the stabbing of Nate Barnard, and tending to support her plea of self-defense.

The State offered testimony in rebuttal.

At the close of all the evidence defendant renewed her motion for judgment as of nonsuit on the charge of murder in the second degree, and excepted to the denial of it.

Verdict: Guilty of manslaughter.

Judgment: Confinement in the Central State Prison at Raleigh, North Carolina, for a term of not less than seven nor more than twelve years.

Defendant appeals therefrom to Supreme Court and assigns error.

*Attorney-General McMullan and Assistant Attorneys-General Bruton, Rhodes, and Moody for the State.*

*George Pennell for defendant, appellant.*

WINBORNE, J. Defendant in brief filed in this Court, expressly abandons her assignments of error based upon exceptions taken to denial of motion made when the State first rested its case, and renewed at the

close of all the evidence for judgment as of nonsuit on the charge of murder in the second degree. And the record shows no exception, or assignment of error based upon exception to the charge of the court to the jury.

The questions presented by defendant on this appeal are predicated upon exceptions (1) to rulings of the court in respect to each of three photographs offered by the State, (2) to the court interposing question as to how defendant struck deceased, (3) to the admission of evidence as to defendant showing a lack of remorse, and (4) to description of the room in which the fatal blow was inflicted.

However, after careful consideration of each point so raised by defendant, prejudicial error is not made to appear.

(1) Defendant makes practically the same argument, and advances substantially the same reasons in her complaint as to the action of the trial judge in allowing the State to offer each of the three photographs, Exhibits S-1, S-2 and S-4. It is argued and contended that there is no sufficient proof of the authenticity or accuracy of the photographs, that they are not material and relevant, that they were not used to illustrate the witness' testimony, and that they are solely calculated to excite prejudice against defendant,—particularly since women were on the jury.

The decisions of this Court uniformly hold that in the trial of cases, civil or criminal, in this State, photographs may not be admitted as substantive evidence, *Honeycutt v. Brick Co.,* 196 N. C., 556, 146 S. E., 227; *S. v. Perry,* 212 N. C., 533, 193 S. E., 727, but that where there is evidence of the accuracy of a photograph, a witness may use it for the restricted purpose of explaining or illustrating to the jury his testimony relevant and material to some matter in controversy. *S. v. Jones,* 175 N. C., 709, 95 S. E., 576; *Elliott v. Power Co.,* 190 N. C., 62, 128 S. E., 730; *S. v. Holland,* 216 N. C., 610, 6 S. E. (2d), 217; *S. v. Wagstaff,* 219 N. C., 15, 12 S. E. (2d), 657; *S. v. Miller,* 219 N. C., 514, 14 S. E. (2d), 522; *S. v. Shepherd,* 220 N. C., 377, 17 S. E. (2d), 469; *S. v. Mays,* 225 N. C., 486, 35 S. E. (2d), 494; *S. v. Stanley,* 227 N. C., 650, 44 S. E. (2d), 196.

In the *Elliott* case, *supra,* the Court says: "Plaintiff excepted because certain pictures were submitted to the jury. All of these pictures were used to explain the witnesses' testimony to the jury. It was not error for the court to allow the jury to consider the pictures for this purpose and to give them such weight, if any, as the jury may find they are entitled to in explaining the testimony."

Ordinarily photographs are competent to be used by a witness to explain or to illustrate anything it is competent for him to describe in words.

The accuracy of a photograph must be shown by extrinsic evidence that the photograph is a true representation of the scene, object or person it purports to portray. 20 Am. Jur., Evidence, Sec. 730; *S. v. Mitchem,* 188 N. C., 608, 125 S. E., 190; *Pearson v. Luther,* 212 N. C., 412, 193 S. E., 739. 32 C. J. S., Evidence, Sec. 715. Wigmore on Evidence, 3rd Ed., Vol. 3, Sec. 793.

The correctness of such representation may be established by any witness who is familiar with the scene, object, or person portrayed, or is competent to speak from personal observation. It is not necessary to prove this fact by the photographer who took the photograph. *Bane v. R. R.,* 171 N. C., 328, 88 S. E., 477; *White v. Hines,* 182 N. C., 275, 109 S. E., 31; *S. v. Matthews,* 191 N. C., 378, 131 S. E., 743; *S. v. Stanley, supra.*

Whether there is sufficient evidence of the correctness of a photograph to render it competent to be used by a witness for the purpose of illustrating or explaining his testimony is a preliminary question of fact for the trial judge. *S. v. Matthews, supra.*

Moreover, if the testimony sought to be illustrated or explained be relevant and material to any issue in the case, the fact that an authenticated photograph is gory, or gruesome, and may tend to arouse prejudice will not alone render it incompetent to be so used.

In the light of these principles, applied to the present case, it appears from the record that the evidence as to the accuracy of the photographs to portray the condition of the house after the homicide, the body as found, and the wound on the body, is sufficient to render them competent for use in illustrating the testimony of the witnesses testifying to their accuracy, for which purpose their admission was expressly limited; that they were not admitted as substantive evidence; and that they were relevant to material matters in issue in the case. But the record indicates a paucity of use for the purpose for which they were offered. Nevertheless, it does not appear on this record that this was prejudicial error.

As to the relevancy of the photographs: The testimony of the witnesses as to the bloody condition of the room, and of the nature of the wound has relation to the character of the attack made by defendant upon the deceased, and that has bearing on the question of self-defense upon which defendant relied. It tends to indicate that she used excessive force, and that the attack was vicious. Thus the photographs were competent for use in illustrating this testimony. And the photograph, Exhibit S-2, was competent for use in illustrating the testimony of the witness bearing upon *corpus delicti.* See *S. v. Miller, supra.*

Moreover, the fact that the photograph showing the wound, described by the doctor, was taken in the morgue, after the body had been cleansed,

does not of itself make it incompetent for use in illustrating the testimony of the doctor. See Scott's Photographic Evidence, Sec. 661, at p. 576.

(2) Regarding the assignment of error based upon the court interposing questions as to how defendant struck deceased: The complaint here is that "the trial judge not only put the words in the witness' mouth by saying 'Give a step like that and hit him,' but then asked how by demonstration, saying 'Give a step like that and hit him.'" It is contended that in this way the trial judge expressed or manifested an opinion forbidden by law. However, the regret of inability "to bring a sound movie and establish before the appellate court the movements of the judge as well as his words" in this incident, seems to be a concession by defendant that the record does not show error. It discloses only the words, leaving all else to imagination. Hence error is not made to appear here.

(3) In reference to the admission of evidence as to defendant showing a lack of remorse: It may be conceded that this question is improper, and that objection to it should have been sustained. Yet when it is considered with the testimony immediately preceding, we fail to find in it error of sufficient prejudicial import to warrant a new trial.

(4) The assignment of error directed to the description of the room in which the fatal blow was inflicted may not be sustained. The evidence indicated great flow of blood immediately following the blow, and that had bearing upon the character of the wound inflicted by defendant upon deceased, and was relevant to be considered by the jury on defendant's plea of self-defense. Moreover, other evidence of like purport was admitted without objection.

Finally, after full consideration of every reason advanced for error, assigned on this appeal, we find no cause to justify the disturbing of the verdict rendered. Hence, in the judgment below there is

No error.