STATE OF NORTH CAROLINA v. WARREN WALTER McKISSICK, JR.

(Filed 11 October, 1967.)

**1. Constitutional Law § 32; Criminal Law § 66—**

The Federal decision that an accused is entitled to be represented by counsel at a pretrial lineup is not to be given retroactive effect, and testimony in this case regarding the identification of defendant at a police station lineup *is held* admissible in evidence, although at the time of the lineup the defendant was not represented by counsel.

**2. Criminal Law § 43—**

A photograph of a defendant in a lineup is competent in evidence for the purpose of illustrating the testimony of witnesses, and, in the absence of a request from the defendant that its admission be restricted, an instruction of the court that the picture was introduced solely for the purpose of "corroborating" a witness, while technically inexact, is not prejudicial, it appearing that the court's remarks effectively limited the jury's consideration of the picture.

**3. Criminal Law § 85—**

Evidence purporting to show the reputation of defendant and his mother for truth and veracity was properly excluded, the defendant being entitled to elicit testimony from his character witnesses only as to his general character and not as to particular traits.

BOBBITT and SHARP, JJ., concur in result.

APPEAL by defendant from *Bailey, J.,* 15 May 1967, Regular Schedule "B" Criminal Session of MECKLENBURG Superior Court.

The defendant was charged in a bill of indictment with the robbery of Richard Neff on 10 February 1966, the bill alleging that with the use of a pistol the defendant robbed Mr. Neff of $89.00 in violation of G.S. 14-87.

The State's evidence tended to show that at about 9:00 o'clock on the evening of 10 February 1966, Neff was operating a service station at King's Drive in Charlotte, and that the defendant and another colored man came there, got change for a dollar, and then, both of them using pistols, robbed him of all the money he had at the station, to wit, $89.00. Four days later Neff went to the city hall and from a lineup of six persons, identified the defendant as being one of the robbers. He also identified him in the courtroom during the trial.

Mrs. Neff was also at the filling station; and her evidence was practically the same as that of her husband, including the identification of the defendant in the line-up and during the trial.

The defendant testified in his own behalf, denying any connection with the robbery and offering an alibi. He said that he had gone to traffic court in the late afternoon of the day in question

and from there to the home of Mrs. Lucille King where he stayed until about 9:00 o'clock. He waited at the King home until that time to get Johnny King to drive him to his home, which was a half mile or less from the Neff service station; that upon his arrival home shortly after 9:00 o'clock, he went to bed and did not leave his home that night. The defendant's mother, Mrs. Nancy Scales McKissick, testified that she was with the defendant at the traffic court and at Mrs. King's, and that upon their arrival home sometime after 9:00 o'clock, the defendant went to bed and did not leave the house any more that night. Mrs. King testified that the McKissicks came to her home at 7:00 o'clock and stayed there until after 9:00 o'clock, and then Johnny King returned home and they left with him for the McKissick home. Larry McKissick, a brother of the defendant, gave the same evidence as had his mother and brother, saying that he was with them at all times referred to in their evidence. Mrs. Minnie Belton Scales, the grandmother of the defendant, testified that she lived with the McKissicks and that they came home about 9:15.

The defendant sought to show his reputation and that of his mother for "truth and veracity."

The State's objection to this evidence was sustained, and the record does not show the proposed answers of the witnesses.

The jury returned a verdict of guilty. A prison sentence of not less than eighteen (18) nor more than twenty-five (25) years was pronounced, and the defendant appealed.

*J. Levonne Chambers, Attorney for defendant appellant.*

*T. W. Bruton, Attorney General; Harrison Lewis, Deputy Attorney General; Robert G. Webb, Trial Attorney; Eugene A. Smith, Trial Attorney, for the State.*

PLESS, J.   The defendant assigned as error the admission of evidence regarding the identification of the defendant at a line-up at the police station and his courtroom identification based thereon. He urges that his constitutional rights secured by the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States and Article I, Sections 11 and 17, of the North Carolina Constitution were violated.

Mr. and Mrs. Neff went to the city hall four days after the robbery and there viewed a line-up with six persons. Both of them identified the defendant as being one of the robbers and also identified him at the trial. The defendant argues that in effect the exhibition of his person before the State's witnesses in the line-up required him to give evidence against himself.

He cites the recent case of *United States v. Wade*, 388 U.S. 218, 18 L. Ed. 2d 1149, decided 12 June 1967, in support of his position. In effect, that case held that placing the defendant in a line-up of six men several weeks after his indictment for robbery was a violation of the defendant's constitutional rights because his counsel was not present at the time of the line-up. The case did not hold that the line-up itself constituted self-incrimination, since merely exhibiting his person for observation by witnesses and using his voice as an identifying physical characteristic involved no compulsion of the accused to give evidence of a testimonial nature against himself which is prohibited by the Fifth Amendment. The decision said:

> "[I]n addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial."

It also held:

> "Since it appears that there is grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial, and since presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial, there can be little doubt that for Wade the post-indictment lineup was a critical stage of the prosecution at which he was 'as much entitled to such aid [of counsel] . . . as at the trial itself.' *Powell v. Alabama*, 287 U.S. 45, 57. Thus both Wade and his counsel should have been notified of the impending lineup, and counsel's presence should have been a requisite to conduct of the lineup, absent an 'intelligent waiver.' See *Carnley v. Cochran*, 369 U.S. 506. No substantial countervailing policy considerations have been advanced against the requirement of the presence of counsel. Concern is expressed that the requirement will forestall prompt identifications and result in obstruction of the confrontations."

While the *Wade* case was not retroactive and therefore would not be controlling in this case, since the occurrence was some five months prior to the *Wade* case, the defendant argues that the reasoning of the case should be accepted in this one.

In response, we call attention to the dissent of Justice Black who said:

> "[T]here is no constitutional provision upon which I can rely that directly or by implication gives this Court power to

establish what amounts to a constitutional rule of evidence to govern, not only the Federal Government, but the States in their trial of state crimes under state laws in state courts. See *Gilbert v. California, supra* [388 U.S. 263, decided June 12, 1967]. The Constitution deliberately reposed in States very broad power to create and to try crimes according to their own rules and policies. *Spencer v. Texas,* 385 U.S. 554. Before being deprived of this power, the least that they can ask is that we should be able to point to a federal constitutional provision that either by express language or by necessary implication grants us the power to fashion this novel rule of evidence to govern their criminal trials.

". . . I have never been able to subscribe to the dogma that the Due Process Clause empowers this Court to declare any law, including a rule of evidence, unconstitutional which it believes is contrary to tradition, decency, fundamental justice, or any of the other wide-meaning words used by judges to claim power under the Due Process Clause. See, *e.g., Rochin v. California,* 342 U.S. 165. I have an abiding idea that if the Framers had wanted to let judges write the Constitution on any such day-to-day beliefs of theirs, they would have said so instead of so carefully defining their grants and prohibitions in a written constitution. With no more authority than the Due Process Clause I am wholly unwilling to tell the state or federal courts that the United States Constitution forbids them to allow courtroom identification without the prosecution's first proving that the identification does not rest in whole or in part on an illegal lineup. Should I do so, I would feel that we are deciding what the Constitution is, not from what it says, but from what we think it would have been wise for the Framers to put in it. That to me would be 'judicial activism' at its worst. I would leave the States and Federal Government free to decide their own rules of evidence. That, I believe, is their constitutional prerogative.

Mr. Justice White also dissents, saying:

"The rule applies to any lineup, to any other techniques employed to produce an identification and *a fortiori* to a face-to-face encounter between the witness and the suspect alone, regardless of when the identification occurs, in time or place, and whether before or after indictment or information. It matters not how well the witness knows the suspect, whether the witness is the suspect's mother, brother, or long-time associate, and no matter how long or well the witness observed the perpetrator

at the scene of the crime. The kidnap victim who has lived for days with his abductor is in the same category as the witness who has had only a fleeting glimpse of the criminal. Neither may identify the suspect without defendant's counsel being present. The same strictures apply regardless of the number of other witnesses who positively identify the defendant and regardless of the corroborative evidence showing that it was the defendant who had committed the crime."

He later says:

". . . [R]equiring counsel at pretrial identifications as an invariable rule trenches on other valid state interests. One of them is its concern with the prompt and efficient enforcement of its criminal laws. Identifications frequently take place after arrest but before indictment or information is filed. The police may have arrested a suspect on probable cause but may still have the wrong man. Both the suspect and the State have every interest in a prompt identification at that stage, the suspect in order to secure his immediate release and the State because prompt and early identification enhances *accurate* identification and because it must know whether it is on the right investigative track. Unavoidably, however, the absolute rule requiring the presence of counsel will cause significant delay and it may very well result in no pretrial identification at all. Counsel must be appointed and a time arranged convenient for him and the witnesses. Meanwhile, it may be necessary to file charges against the suspect who may then be released on bail, in the federal system very often on his own recognizance, with neither the State nor the defendant having the benefit of a properly conducted identification procedure.

"Nor do I think the witnesses themselves can be ignored. They will now be required to be present at the convenience of counsel rather than their own. Many may be much less willing to participate if the identification stage is transformed into an adversary proceeding not under the control of a judge. Others may fear for their own safety if their identity is known at an early date, especially when there is no way of knowing until the line-up occurs whether or not the police really have the right man."

The case of *Stovall v. Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199 was decided June 12, 1967 by a divided Court, the same day as the *Wade* case. It deals with the identification of an accused person by

his accuser in the absence of his attorney. Recognizing the significance of the two opinions (*Wade and Denno*), it said:

> "We hold that *Wade* and *Gilbert* affect only those cases and all future cases which involve confrontations for identification purposes conducted in the absence of counsel after this date.
>
> "The law enforcement officials of the Federal Government and of all 50 States have heretofore proceeded on the premise that the Constitution did not require the presence of counsel at pretrial confrontations for identification. Today's rulings were not foreshadowed in our cases; . . . The overwhelming majority of American courts have always treated the evidence question not as one of admissibility but as one of credibility for the jury . . . Law enforcement authorities fairly relied on this virtually unanimous weight of authority, now no longer valid, in conducting pretrial confrontations in the absence of counsel. It is, therefore, very clear that retroactive application of *Wade* and *Gilbert* 'would seriously disrupt the administration of our criminal laws.' "

The Court's opinions say that while a line-up is not unconstitutional *per se*, that without the defendant's attorney present, it is —but that this wrong, illegal as it is, is only so tomorrow—not today!

A constitutional right enacted almost two centuries ago, and with no change or amendment, has been suddenly and belatedly found violated — in the future — but not in the past!

To get to the mechanics of an attorney's presence at a line-up, what is his function or authority? Is he empowered to forbid his client to appear, or to speak, or to gesture? If he does, is his client to obey, and thus to defeat the purpose of the line-up?

· And if the attorney objects to any feature of the line-up, who shall rule upon it? The jailer, detective or police sergeant?

And upon an adverse ruling shall the accused, upon failure to comply, be subject to contempt proceedings? If so, when, and before what tribunal?

On the other hand, if the attorney cannot interpose objections nor instruct his client, what purpose does he serve? If he sees a wrong done his client, must he withdraw as counsel and become a witness?

The above questions are not facetious — they are just sensible and practical. But they unanswerably demonstrate the unrealistic results of the opinions in the *Wade* and *Denno* cases.

A fair line-up, composed of several men of the general appear-

ance of the suspect is as fair a way of identifying the guilty as can be devised. There is no suggestion or intimation as to which is the guilty person. And it is only natural for the victim to seek punishment of the perpetrator of the wrong. He is motivated by one of the greatest forces in human nature: to see that his wrongdoer, not somebody else, is punished.

If a line-up is fraudulently composed, the defendant can give his attorney this information for the purpose of cross examination. But if the attorney is present and has to become a witness, he can only give the information to his successor who, too, can only cross examine about it.

The *Wade* and *Denno* decisions can only be interpreted as requiring a full-time, twenty-four-hour-a-day, court-appointed lawyer on full duty to represent the rights of a suspect.

In the event of a one-man robbery where the description of the robber might fit three or four persons in the vicinity, three admittedly innocent persons of the four suspects could be arrested with probable cause at eleven o'clock on a Friday night. A judge to appoint counsel is not usually available—neither are attorneys, if they can avoid it. But under these opinions, the victim of the rape or robbery cannot release the three innocent suspects by declaring that one is the perpetrator. The remaining innocent ones must be kept ·in prison at least overnight, or over the weekend, until a judge can be found to appoint counsel, and counsel can be found to accept appointment — not only to identify the alleged guilty, but to release the admittedly and uncharged innocent.

The defendant further excepts to the admission of the photograph of the line-up as violative of his rights under the constitutional sections referred to earlier. The photograph was properly identified and entered into evidence for the purpose of illustrating the testimony of the witness. *State v. Norris,* 242 N.C. 47, 86 S.E. 2d 916; *State v. Chavis,* 231 N.C. 307, 56 S.E. 2d 678; *State v. Gardner,* 228 N.C. 567, 46 S.E. 2d 824; Stansbury, North Carolina Evidence § 34; 1 Strong, North Carolina Index, Criminal Law § 43; 11 A.L.R. 2d 895.

Although the defendant objected to the questions identifying the picture, he did not ask that its admission be restricted, and without such request, his exception is not good. *State v. Cade,* 215 N.C. 393, 2 S.E. 2d 7.

The defendant's interests were protected by the Court when the jury was told that the photograph was received only for the purpose of "corroborating" the witness and only to the extent that it does corroborate the witness. This instruction is not correct since photographs are competent for the purpose of illustrating the testi-

mony of the witnesses; but inasmuch as the instruction at least limited the photograph, we do not consider the use of the word "corroborate" instead of "illustrate" as constituting substantial error.

The remaining exceptions asserted by the defendant are that his questions seeking to prove the reputation of the defendant and his mother for truth and veracity were not allowed. The Court sustained the objections to them and in doing so was correct. Reputation for particular traits of character is not permissible. A witness can only testify to the *general character* of a person. 1 Strong, North Carolina Index, Criminal Law § 80; *State v. Sentelle*, 212 N.C. 386, 193 S.E. 405.

It is also noted that the answers which would have been given to these questions are not supplied. Since we have no way of knowing whether the proposed answers would have been favorable or unfavorable to the defendant, or whether they would have included incompetent and irrelevant statements, these exceptions are overruled.

With full respect for the amenities, we think it proper to voice our disagreement with the *Wade* and *Denno* decisions and to point out their fallacies. We do not question the intentions of the five justices who made them. The other four members of the Court either dissented or did not fully concur.

In our opinion, the reasoning of the dissenting opinions seems to us more practical than the opinion of the Court.

We respect and admire the wisdom of our predecessors. Our almost two-centuries-old Constitution has not been fundamentally changed — certainly not in the Bill of Rights contained in the first ten amendments, but the construction of them *has* within the past few years. When any court or justice makes an interpretation which is not in conformity with those of John Marshall, Edward Douglas White, Oliver Wendell Holmes, William Howard Taft or Charles Evans Hughes, it is subject to scrutiny.

And by whom? Is any court or group in better position to do so except the highest courts of the states with their guaranteed authority?

North Carolina was hesitant — even reluctant — to ratify the United States Constitution. It refused to do so until the Bill of Rights was added, and the most important of these was the Tenth Amendment which provides: "The powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states, respectively, or to the people."

We must respectfully say that in our opinion this wise and vital provision of the Constitution has not had due consideration.

The defendant has had a fair trial in which there was
No error.

BOBBITT and SHARP, JJ., concur in result.