## STATE v. JOSEPH SAMUEL MILLER.

(Filed 7 May, 1941.)

**1. Homicide § 23: Criminal Law § 38a—**

The admission in evidence of photographs of the scene of the homicide, one as deceased was found and the other after he had been turned over to show his face in order to identify him, for the purpose of illustrating the testimony of the witnesses, and the use of the photographs by the solicitor in his argument for such purpose, is not error.

**2. Homicide § 27h—Where all evidence tends to show murder in perpetration of robbery, court need not submit question of guilt of less degrees of crime.**

The State's evidence tended to show that defendant killed deceased in the perpetration of, or attempt to perpetrate, a robbery. Defendant's testimony was to the effect that he and a companion, pursuant to a conspiracy, were perpetrating or attempting to perpetrate a robbery, and that, both being present, his companion fired the fatal shot. *Held:* The court correctly limited the jury to a verdict of guilty of murder in the first degree or not guilty, there being no evidence of defendant's guilt of a less degree of the crime. C. S., 4200.

**3. Homicide § 2—**

Where, in pursuance of a preconceived plan to rob, one of the conspirators, both being present, shoots their victim while perpetrating or attempting to perpetrate the robbery, both are guilty of murder in the first degree. C. S., 4200.

**4. Homicide § 27h—**

Where all the evidence tends to show defendant's guilt of murder committed in the perpetration of, or attempt to perpetrate, a robbery, the fact that after charging the law on this aspect of the case, the court also charges the law of premeditation and deliberation, does not render the court's failure to submit to the jury the question of defendant's guilt of a less degree of the offense erroneous.

**5. Homicide § 27f—**

Where defendant does not plead insanity and offers no evidence that he was not capable of understanding and knowing what he was doing, the court is not required to charge the jury on the question as to whether defendant was mentally capable of committing the crime.

**6. Criminal Law § 79—**

Exceptions not brought forward in appellant's brief are deemed abandoned. Rule of Practice in the Supreme Court No. 28.

APPEAL by defendant from *Alley, J.,* at regular term of criminal court, January, 1941, of MECKLENBURG.

Criminal prosecution upon indictment charging defendant with murder of C. C. Ritter.

In the trial court evidence for the State tends to show these facts: About midnight on the night of 13 December, 1940, the body of C. C. Ritter was found crumpled under a tree near an automobile on a lot just off the sidewalk of Central Avenue and across the avenue from his barber shop in the city of Charlotte, Mecklenburg County, North Carolina. He was dead. His death was caused by a wound inflicted by a 38 caliber bullet fired into the back of his head, and which lodged in the brain.

Defendant, a Negro boy, then approximately one month less than eighteen years of age, was arrested on the following Wednesday morning, and voluntarily confessed to police officers that he killed C. C. Ritter. His statement was taken down by Mr. Hunter, of the *Charlotte Observer*.

His statements in this connection are to the effect that he had previously worked at the shop of C. C. Ritter and knew him and his habits; that prior to 13 December, 1940, he had obtained a pistol from John Henry Thomas, a Negro boy, and on Wednesday before that date, had bought five "38" caliber cartridges from a hardware store operated by a Mr. Cathey on Central Avenue; that on the night of 13 December, 1940, as he was walking along Lamar Avenue towards and near Central Avenue he saw Mr. Ritter "coming out of his place" and locking his door; that he, defendant, had this gun which he had obtained from John Thomas; that he came across to Mr. Ritter's automobile and waited behind it until Mr. Ritter got there; that when Mr. Ritter opened the door of his car, he, defendant, "throwed the pistol on him and told him to give him his money"; that Mr. Ritter turned around and started to walk off, and said or told defendant that he would call the police, and he shot him; that he did not intend to kill him—just meant to shoot him in the shoulder, to keep him from calling the police; that he, defendant, then ran down the railroad toward Barnhardt Manufacturing Company, and returned about an hour later to see if Mr. Ritter was there, "thinking that the man was only wounded, and that he would be gone"; that when he returned he found Mr. Ritter was dead, and "then took his money off him and went back to Lamar Avenue, and . . . to the railroad"; that he got twenty-nine dollars, consisting of bills and silver; that he took the money and went to the Brooklyn section and gave Mildred Reid six dollars, and bought clothing for himself with the balance; that he had been drinking some on the night of the killing; that he carried the pistol back and put it in John Thomas' house.

The State further offered testimony of Mildred Reid to the effect that she saw defendant at eleven o'clock and after on the night of the killing, and, in her words, "Joe didn't seem to be drunk that night, seemed to be sober. He was nice and quiet and acted like he always *have* acted."

The State further offered testimony of John Henry Thomas, a Negro boy, twenty years of age, to the effect that on Sunday, 15 December, 1940, having heard while caddying at a golf course that Joe Miller shot Mr. Ritter, he said to defendant as they were returning, "Joe, I heard you shot Mr. Ritter with my gun, and I want to know if it's so," and that after some conversation he said: "Yes, I shot Mr. Ritter . . . I did not mean to kill him, just meant to shoot him in the shoulder, to keep him from calling the police."

The State further offered evidence tending (1) to identify defendant as the one who purchased cartridges from Mr. Cathey, and (2) to show (a) that he did give Mildred Reid six dollars on night of 13 December, (b) that pistol was found at the place named by defendant; and (c) that defendant took officers to each place where he bought clothing.

Defendant as witness for himself testified that about ten-thirty o'clock on Friday morning, 13 December, John Thomas talked with defendant, said that he had some bills to pay, and suggested getting some money; that on being asked by defendant where he was going to get the money, he said he didn't know but he had found a place to get some; that at 7:15 that night John Thomas showed defendant where he kept his gun, and said, "We are going to get the gun or we're going to get some money," and that he was going out to Mr. Ritter's barber shop; that on being asked by defendant what he was going to do with the gun, he said, "We're going to take it along for a bluff"; that he, defendant, did not know that Thomas had any intention of using that gun to kill Mr. Ritter. Then, continuing, defendant testified: "The gun that Mr. Ritter was killed with was the gun of John Thomas. On the night of this homicide John Thomas and I . . . come down there on Lamar Avenue and Central and waited behind the sign board till Mr. Ritter started from his barber shop, and then as he was crossing the street I stepped behind his car and Thomas stepped out in front of him and asked him for his money . . . I did not have any weapon with me at all . . . I did not have any desire to injure Mr. Ritter. . . . So far as I know Mr. Ritter never did see me . . . After Mr. Ritter was shot we went down the railroad, down by the Louise Mill . . . We stayed there about an hour and . . . come back up where his body was. I got Mr. Ritter's money. It was folded in his hip pocket in bills; Yes, sir, he had some silver, I think about five or six dollars of silver in his coat pocket. Mr. Ritter had fifty-six dollars in all, and I got twenty-eight dollars and John Thomas got the other. After Mr. Ritter was shot we went . . . and . . . stopped and divided the money—there in the light of the laundry . . . After dividing the money I went over to Mildred Reid's, my girl friend's, house that night . . . I did give her six dollars. John Thomas carried the gun home with him . . ."

STATE *v.* MILLER.

Continuing, defendant testified: "On December 13th we left home about a quarter past seven. I went over to John Thomas' house, that is where we started from to go rob Mr. Ritter . . . At the time I started up there with John Thomas and at the time Mr. Ritter was shot,—I was drinking wine. I had had just about two pints. I had been drinking wine that night; well, I started around six-thirty . . . I had been drinking wine a pretty good while . . ."

And, continuing, defendant testified: "When I got over here to the police I told them that I had done it; I told them very much what I have told on the witness stand. Well, before it happened Thomas said if I got caught he wanted me to take it on myself and leave him out of it, and if he got caught he would do the same for me. Yes, sir, I took it on myself about two weeks before court time . . . I want to say that I did not have anything against Mr. Ritter and I did not kill Mr. Ritter, and I want to ask the court to spare my life, because I did not kill him."

Then, on cross-examination, defendant testified that he knew the time Mr. Ritter quit the shop at night, knew he took in considerable money on Friday, knew he carried money home with him when he left the shop, knew he did not keep any money in his cash register, knew he put it in his pocket, knew he left in an automobile to go home, knew where he parked his car, and knew the direction he was going to take to his home. He said: ". . . I and Thomas had planned this to go get his money, and if I got caught, whoever got caught would take it on himself. I will say it was planned that day about ten-thirty in the morning. . . . I had planned the whole thing out what I was going to do and how I was going to rob him. . . . I had planned to take this old pistol down there and use it, and if it took that to get the money that was what I was going to do. . . . I shot to wound him, to keep him from telling the police. Yes, sir, he told me he was going to tell the police, but I didn't shoot him. . . . I shot to wound him that was the idea. . . . This boy and I were working together by way of an agreement, . . . in furtherance of the agreement that I had between us at ten-thirty that morning before Mr. Ritter got killed . . . I told Mr. Ernest Hunter, the City Editor of the *Charlotte Observer,* that night and these men in his presence that I had shot Mr. Ritter and I shot him to wound him in the shoulder because he was going to get the police after me. We made up that story that we were going to shoot him in the shoulder before we left home. . . . The purpose was if we had to shoot him that we would shoot him in the shoulder to wound to keep him from going after the police. . . . Thomas said if he started to holler he would shoot him in the shoulder and wound him . . . I helped frame that up . . . I first saw Mr. Ritter in his barber

shop. We was passing his shop, going up Central Avenue; he was cutting somebody's hair, and we went straight on out Central Avenue up to Pecan; we went up Pecan Avenue and stayed at the drug store about ten minutes; went down Pecan to the railroad, came up Pecan and out High Street, crossed Clement and went down to Lamar and stayed behind the sign-board there until he came out of his shop. Yes, sir, I mean we hid and concealed ourselves and waited on the man to come out so we could rob him. After he was shot we ran. . . . We went back and got his money."

And, finally, defendant said: "I did not kill Mr. Ritter on December 13th, I didn't shoot him. Yes, sir, it was part of a plot. I again say I didn't kill him."

As witness for defendant, his grandmother testified: "Since Joe growed up he likes to have his own way. It seems his mind don't go right like it ought to. Now, when he was small, I could get him to go most any way. Since he growed up, since he got that lick on his head, he got hit in the head with a brick in June, he has been sort-a 'modest' like, that was in June, 1940. He went to the hospital. He was in there from Saturday night till Thursday . . . Since that time he has acted like he didn't have good sense. Just sit and looked. I would say, 'Joe, what's the matter,' and he would say, 'Nothing.' He would say that any time, when he was up, sitting down he just sit and looked and looked. When he come home from the hospital he had a place over this eye, and that place bled two or three times. He had to go and have it dressed, but whether it broke the skull or not, I don't know. No, he has not acted since then like he did before. He acted crazy like around the house."

Verdict: Guilty of murder in the first degree.

Judgment: Death by asphyxiation.

Defendant appeals therefrom to Supreme Court, and assigns error.

*Attorney-General McMullan and Assistant Attorneys-General Bruton and Patton for the State.*

*J. C. Newell and Hiram P. Whitacre for defendant, appellant.*

WINBORNE, J. A painstaking scrutiny of the record, and a careful consideration of the questions presented in brief of counsel for defendant fail to disclose prejudicial error.

The first exception relates to the admission in evidence of photographs identified as having been taken at one o'clock on the morning of 14 December at the scene where the body of deceased was found, one the "way it was when we got there"—and the other after he was turned over "to get a facial picture of him to see if he could be definitely identified."

The seventh exception is directed to the action of the solicitor in showing the photographs to the jury during his argument. The record shows that when these photographs were admitted in evidence the court instructed the jury that they were not offered as substantive evidence, but only for the purpose of illustrating the testimony of the witness, if the jury should find that they do illustrate it. Then, again, in his charge the court repeated the instruction, and further expressly charged that the jury should not consider them as substantive evidence as "tending to prove any of the main facts at issue." For the purpose for which the photographs were offered and received in evidence, they are competent. The record fails to show that the solicitor used them for any other purpose. Hence, their admission in evidence for the purpose stated is in accord with well settled rule of law in this State. *Pickett v. R. R.,* 153 N. C., 148, 69 S. E., 8; *S. v. Jones,* 175 N. C., 709, 95 S. E., 576; *S. v. Lutterloh,* 188 N. C., 412, 124 S. E., 752; *Honeycutt v. Brick Co.,* 196 N. C., 556, 146 S. E., 227; *S. v. Perry,* 212 N. C., 533, 193 S. E., 727; *S. v. Holland,* 216 N. C., 610, 6 S. E. (2d), 217.

Defendant next contends that the court erred in limiting the jury to the rendition of one of two verdicts, "Guilty of murder in the first degree" or "Not Guilty." Exceptions 8 and 9.

It is provided in C. S., 4200, that "A murder . . . which shall be committed in the perpetration, or attempt to perpetrate any . . . robbery, . . . or other felony, shall be deemed to be murder in the first degree and shall be punished by death." Speaking thereto in the case of *S. v. Spivey,* 151 N. C., 676, 65 S. E., 995, Manning, J., for the Court, said: "Where the evidence tends to prove that a murder was done, and that it was done by means of poison, lying in wait, imprisonment, starving, torture, or which has been committed in perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony, and where there is no evidence and where no inference can fairly be deduced from the evidence of or tending to prove a murder in the second degree or manslaughter, the trial judge should instruct the jury that it is their duty to render a verdict of 'guilty of murder in the first degree,' if they are satisfied beyond a reasonable doubt, or of 'not guilty.' If, however, there is any evidence or if any inference can be fairly deduced therefrom, tending to show one of the lower grades of murder, it is then the duty of the trial judge, under appropriate instructions, to submit that view to the jury. It becomes the duty of the trial judge to determine, in the first instance, if there is any evidence or if any inference can be fairly deduced therefrom, tending to prove one of the lower grades of murder." See, also, *S. v. Newsome,* 195 N. C., 552, 143 S. E., 187; *S. v. Donnell,* 202 N. C., 782, 164 S. E., 352.

In the present case, if the evidence for the State is to be believed, the defendant, in the perpetration of, or in an attempt to perpetrate a robbery of C. C. Ritter, shot and killed him. The homicide so committed is murder in the first degree. C. S., 4200; *S. v. Logan,* 161 N. C., 235, 76 S. E., 1; *S. v. Miller,* 197 N. C., 445, 144 S. E., 590; *S. v. Donnell, supra; S. v. Satterfield,* 207 N. C., 118, 176 S. E., 466; *S. v. Green,* 207 N. C., 369, 177 S. E., 120; *S. v. Alston,* 215 N. C., 713, 3 S. E. (2d), 11; *S. v. Kelly,* 216 N. C., 627, 6 S. E. (2d), 533.

If, on the other hand, the testimony of the defendant, as witness in his own behalf, is to be believed, the killing of C. C. Ritter was done by John Henry Thomas, while he and defendant, as co-conspirators in a preconceived plan to rob C. C. Ritter, were perpetrating or attempting to perpetrate a robbery of him. This too made the homicide murder in the first degree, and both of them would be guilty. *S. v. Bell,* 205 N. C., 225, 171 S. E., 50; *S. v. Stefanoff,* 206 N. C., 443, 174 S. E., 411; *S. v. Green, supra.*

There is no evidence of a lesser degree of homicide. *S. v. Spivey, supra; S. v. Myers,* 202 N. C., 351, 162 S. E., 764; *S. v. Ferrell,* 205 N. C., 640, 172 S. E., 186; *S. v. Gosnell,* 208 N. C., 401, 181 S. E., 323.

Hence, there is no error in limiting the jury to one of two verdicts, murder in the first degree or not guilty. *S. v. Donnell, supra; S. v. Satterfield, supra.*

Defendant further complains that in addition to charging the jury on the subject of homicide committed while in the perpetration, or attempt to perpetrate a robbery, the court went further and charged on the subject of "a willful, deliberate and premeditated killing," and still limited the jury to one of two verdicts as hereinbefore stated. Even so, as was similarly stated by this Court in *S. v. Logan,* 161 N. C., 235, 76 S. E., 1, his honor might well have omitted from his charge all reference to "premeditation and deliberation," for the entire evidence in the record shows that C. C. Ritter was slain either by defendant as principal, or by John Henry Thomas as co-conspirator of defendant, acting in a concerted plan with defendant, in the perpetration of, or attempting to perpetrate a robbery of C. C. Ritter. See, also, *S. v. Alston, supra.*

Defendant further contends that the court should have instructed the jury on the question as to whether defendant was mentally capable of committing the crime. There is no evidence that the defendant was not capable of knowing and understanding what he was doing. Compare *S. v. Murphy,* 157 N. C., 614, 72 S. E., 107; *S. v. Alston, supra.* In fact, it appears from the charge of the court below that defendant did not then undertake to exculpate himself upon the ground of insanity. Yet the court was liberal in charging the jury as to his contentions in respect to all that the evidence tends to show as to the blow on his head,

as well as to the circumstances under which he was reared by an aged grandmother, and as to his condition in life.

There are other exceptions appearing in the record which are not brought forward in defendant's brief and are deemed abandoned. Rule 28 of the Rules of Practice in the Supreme Court, 213 N. C., 808. However, we find no merit in them.

In the judgment below there is

No error.