## STATE v. CHARLES GONZAGA STREETON.

### (Filed 14 December, 1949.)

**1. Homicide § 4d—**

A murder committed in the perpetration or attempted commission of the felony of kidnapping or holding a human being for ransom, G.S. 14-39, constitutes murder in the first degree, G.S. 14-17, and an instruction to this effect upon supporting evidence cannot be held for error.

**2. Homicide § 1b—**

G.S. 14-17 does not change the common law definition of murder but merely divides murder as defined by the common law into two degrees.

APPEAL by the prisoner from *Patton, Special Judge,* and a jury, at the July Term, 1949, of GUILFORD.

The prisoner was indicted for the murder of Carl Davis. The testimony for the State disclosed the matters set forth below.

The deceased, Carl Davis, was the crippled son of McKinley Davis, a coal and ice dealer in High Point. He and the prisoner, Charles Gonzaga Streeton, had married sisters. In March, 1949, however, Carl Davis and his wife were separated. He was then residing in the household of his parents in High Point.

At 7 o'clock p.m. on Monday, 14 March, 1949, Streeton borrowed a 38-caliber pistol and five cartridges of like diameter from the State's witness, Lloyd Portee, for the avowed purpose of protecting himself during a proposed trip to the Virginia mountains. On the following day, i.e., at 5:00 o'clock p.m. on Tuesday, 15 March, 1949, Streeton returned the pistol and four 38-caliber cartridges to Portee. The evidence does not reveal whether the pistol had been freshly fired or cleaned when Streeton delivered it to Portee.

Meanwhile, the events depicted in the next four paragraphs transpired.

Witnesses for the State saw a gray Mercury Sedan owned by Carl Davis and a green Studebaker car belonging to Streeton standing beside the College Grill, a cafe near the eastern edge of High Point, from 8:00 p.m. until 9:30 p.m. on Monday, 14 March, 1949. Carl Davis and Streeton spent this time in the Mercury automobile, talking, eating and drinking beer together. This was the last time that Carl Davis was seen alive by any of the witnesses. The evidence does not indicate directly how or when the prisoner, or the deceased, or the motor cars left this spot.

At 10:30 p.m. on the same night, a taxi driver named Roy Hunt picked up a fare in the neighborhood in which the Mercury car was afterwards found, and transported him to a place near the College Grill, where he alighted and proceeded on foot towards the College Grill. Hunt did not identify his passenger as the prisoner, but he described his size and clothing. The description tallied with that of Streeton as given by other witnesses who saw him earlier in the evening.

Shortly after midnight, John H. McAdoo, Jr., a policeman of Greensboro, saw Streeton near the telephone booths in the Union Bus Terminal at Greensboro, and noted that Streeton was observing him "very carefully." About this time, to wit, at 12:20 a.m. on Tuesday, 15 March, 1949, Mrs. Rosa Tillman, a telephone operator on duty in Greensboro, took a long distance call, which originated in a booth at the Union Bus Station in Greensboro, for the phone in the residence of the parents of the deceased in High Point. According to McKinley Davis, his telephone rang "around 12:30 or 12:35" a.m. on Tuesday, 15 March, 1949, and it was answered by his wife, who had an undisclosed conversation with some person not identified.

In consequence of this conversation, Mr. and Mrs. McKinley Davis went forthwith to the police station in High Point, where they reported the disappearance of Carl Davis and the phone conversation to the police, who cautioned them to keep these matters secret until the mystery surrounding the vanishing of their son should be solved. Pursuant to this admonition, Mr. and Mrs. McKinley Davis withheld these matters from the press and public. Immediately after their visit to the police station, the empty Mercury Sedan of the deceased was discovered by policemen in a vacant lot "in the 1500 block of North Main Street" in High Point.

At 8:45 p.m. on Tuesday, 16 March, 1949, the telephone in the Davis home rang again. It was answered by McKinley Davis, who had an undisclosed colloquy with some man whose voice he could not identify. He had "never talked to Charles Streeton on the phone." McKinley Davis immediately reported the phone conversation to his son-in-law, Wilber J. Alexander, who was present and who forthwith dashed onto the front lawn, where he found a handkerchief "with a rock and a note tied up in it." The note was as follows: "No marked money. Have you

got money. 5000. If so put in bag. Leave at 9 :30 P. M. at Hieway Cafe mail box or he wont be safe. If got money he will be home in 10 hrs OK. If you get me, they get Carl. Hieway Cafe at Maryfield Hospital Jamestown." The note was penciled in printed capitals.

Assisted by police officers, McKinley Davis proceeded without delay to a point on the High Point-Jamestown Highway near the Maryfield Convalescent Home, where he put a paper-filled money bag in a mail box lettered "Highway Cafe." This box was shadowed by heavy shrubbery, stood in front of what was then a vacant house, and was located "about five or six city blocks" from the place where the prisoner resided.

At 11 :15 p.m. on the same night, Streeton drove to the "Highway Cafe" mail box in his Studebaker car, alighted, and opened the mail box with his right hand, which was infolded in a white cloth. He was thereupon arrested by police officers, who had been hiding nearby and who conveyed him to the police station in High Point.

According to W. T. Highfill, a policeman, this colloquy took place between him and Streeton as soon as they reached the police station: "I said : 'You know what we have you here for, and we want to know where that boy is.' He said : 'I don't know where Carl is.' At the time Charles Streeton said that, Carl Davis' name had not been mentioned. Nothing had appeared in the newspapers at that time that Carl Davis was missing."

At 8 :00 p.m. on Wednesday, 16 March, 1949, Streeton made a statement "with reference to the location of the body of the deceased, Carl Davis." In consequence thereof, the corpse of Carl Davis was found under a bridge which spanned a small watercourse in an isolated spot on the campus of High Point College. An autopsy revealed that death had resulted from a 38-caliber bullet, which entered the back of the deceased and left powder burns on both the clothing and the flesh at the point of entrance. The physicians, who performed the autopsy, expressed no opinions as to the time of occurrence of death, and no effort was made to show that the bullet, which was recovered, had been fired from the pistol which Portee had loaned Streeton.

On Friday, 18 March, 1949, Streeton's wife visited the jail and asked him this question in the presence of certain of the State's witnesses: "Why did you kill Carl?" He replied: "You know how bad we needed money.". Sometime later on the same occasion Streeton told his wife in the presence of the same witnesses that "he killed Carl because Carl had made a slighting remark" about her.

The only evidence offered in behalf of the prisoner was medical testimony indicating that he had been afflicted by mental instability for some years.

· The trial judge instructed the jury that it could return any one of five different verdicts, to wit: (1) Guilty of murder in the first degree; (2) guilty of murder in the first degree with recommendation that the punishment be imprisonment for life in the State's prison; (3) guilty of murder in the second degree; (4) guilty of manslaughter; and (5) not guilty.

·  The jury found the prisoner guilty of murder in the first degree and recommended that his punishment be imprisonment for life in the State's prison in conformity to G.S. 14-17 as rewritten by chapter 299 of the 1949· Session Laws, and the court entered judgment accordingly. The prisoner excepted and appealed, assigning as error the receipt of certain testimony and specified excerpts from the charge.

*Attorney-General McMullan and Assistant Attorney-General Bruton for the State.*

*C. A. York, Sr., and C. A. York, Jr., for the prisoner, appellant.*

·  ·ERVIN, J. The prisoner reserved exceptions to various parts of the charge in which the trial judge instructed the petit jury in specific detail that it would return a verdict of guilty of murder in the first degree in the event it found beyond a reasonable doubt from the testimony that the prisoner undertook by force or violence to kidnap the deceased or to hold him for ransom and thereby unintentionally caused his death. It is manifest that the facts and circumstances adduced by the State at the trial were sufficient to warrant a finding that the deceased met death in the manner indicated in these instructions. Hence, the exceptions now under review raise the question as to whether these portions of the charge embody a principle recognized as valid by the law of homicide.

· It is to be noted that G.S. 14-39 makes it a felony for any person "to kidnap . . . any human being . . . or to hold any human being for ransom."

Murder is not divided into degrees at common law, any unlawful killing of a human being with malice aforethought, either express or implied, being murder. *S. v. Trott,* 190 N.C. 674, 130 S.E. 627; 42 A.L.R. 1114; *S. v. Dalton,* 178 N.C. 779, 101 S.E. 548; *S. v. Banks,* 143 N.C. 652, 57 S.E. 174; *S. v. Cole,* 132 N.C. 1069, 44 S.E. 391; *S. v. Bishop,* 131 N.C. 733, 42 S.E. 836; *S. v. Johnson,* 23 N.C. 354, 35 Am. D. 742; *S. v. Negro Will,* 18 N.C. 121; *S. v. Reed,* 9 N.C. 454; *S. v. Boon,* 1 N.C. 191.

Malice aforethought is implied at common law in homicides where the slayer kills another while engaged in committing or attempting to commit a felony, and consequently such a killing constitutes murder, whether the death be intended or not. 26 Am. Jur., Homicide, section 195; 40 C.J.S., Homicide, section 21; Warren: Homicide (Perm. Ed.), section 74. The rule applies to felonies created by statute as well as to common law

felonies. Brill: Cyclopedia of Criminal Law, section 633; Burdick: The Law of Crime, section 454. It has been suggested, however, that the rule should be confined to homicides committed in the perpetration of felonious acts having a natural tendency to cause death. *Regina v. Serne,* 16 Cox C. C. 311; *People v. Goldvarg,* 346 Ill. 398, 178 N.E. 892; *Powers v. Commonwealth,* 110 Ky. 386, 61 S.W. 735; 63 S.W. 976, 53 L.R.A. 245; *People v. Pavlic,* 227 Mich. 562, 199 N.W. 373; Holmes: The Common Law, 57-59; Burdick: The Law of Crime, section 454. Such limitation may be implicit in the undoubted requirement that the homicide must be a natural and reasonable consequence of the felony being perpetrated. 40 C.J.S., Homicide, section 21; Burdick: The Law of Crime, section 454.

The General Assembly of 1893 adopted the statute now embodied in G.S. 14-17, dividing murder into two degrees. This statute does not give any new definition of murder, but permits that to remain as it was at common law. The enactment simply selects out of all murders denounced by the common law those deemed more heinous on account of the mode of their perpetration; classifies them as murder in the first degree; and provides a greater punishment for them than that prescribed for "all other kinds of murder," which it denominates murder in the second degree. *S. v. Smith,* 221 N.C. 278, 20 S.E. 2d 313; *S. v. Dalton, supra.*

The Legislature regarded the felony-murder sufficiently atrocious to be included in the category of first degree murder. For this reason, the statute now codified as G.S. 14-17 contains this provision: "A murder . . . which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony shall be deemed to be murder in the first degree."

It is evident that under this statute a homicide is murder in the first degree if it results from the commission or attempted commission of one of the four specified felonies or of any other felony inherently dangerous to life, without regard to whether the death be intended or not.

There are now many statutory felonies which have no natural tendency to cause death and by reason thereof are much less serious crimes than the common law felonies giving rise to the felony-murder rule. We express no opinion, however, as to whether the words "other felony" as used in the statute mean any statutory felony, or are limited under the *ejusdem generis* principle to felonies dangerous to life. No such question is raised by the present record.

The statutory provision declaring a felony-murder to be murder in the first degree has been applied many times to homicides resulting from the commission or attempted commission of arson (*S. v. Anderson,* 228 N.C. 720, 47 S.E. 2d 1); burglary (*S. v. Bell,* 205 N.C. 225, 171 S.E. 50); rape (*S. v. King,* 226 N.C. 241, 37 S.E. 2d 684; *S. v. Mays,* 225 N.C. 486, 35 S.E. 2d 494); and robbery (*S. v. Biggs,* 224 N.C. 722, 32 S.E. 2d 352;

STATE *v.* STREETON.

*S. v. Miller,* 219 N.C. 514, 14 S.E. 2d 522; *S. v. Kelly,* 216 N.C. 627, 6 S.E. 2d 533; *S. v. Williams,* 216 N.C. 446, 5 S.E. 2d 314; *S. v. Alston,* 215 N.C. 713, 3 S.E. 2d 11; *S. v. Exum,* 213 N.C. 16, 195 S.E. 7; *S. v. Linney,* 212 N.C. 739, 194 S.E. 470; *S. v. Glover,* 208 N.C. 68, 179 S.E. 6; *S. v. Green,* 207 N.C. 369, 177 S.E. 120; *S. v. Stefanoff,* 206 N.C. 443, 174 S.E. 411; *S. v. Langley,* 204 N.C. 687, 169 S.E. 705; *S. v. Donnell,* 202 N.C. 782, 164 S.E. 352; *S. v. Myers,* 202 N.C. 351, 162 S.E. 764; *S. v. Sterling,* 200 N.C. 18, 156 S.E. 96; *S. v. Westmoreland,* 181 N.C. 590, 107 S.E. 438; *S. v. Lane,* 166 N.C. 333, 81 S.E. 620.)

The occasion for invoking the felony-murder rule ordinarily arises in homicides resulting from the perpetration or attempted perpetration of the four felonies specifically named in the statute, *i.e.,* arson, burglary, rape and robbery. This is necessarily true because these four offenses are so highly perilous to life. But this Court has declared that under the statute "murder committed in the perpetration of a felony is now murder in the first degree," and has sanctioned the application of this doctrine to a homicide resulting from an attempt to perpetrate an unspecified felony, *i.e.,* a larceny, under circumstances dangerous to life. *S. v. Covington,* 117 N.C. 834, 23 S.E. 337.

When a person undertakes by force or violence to kidnap another or to hold him for ransom contrary to G.S. 14-39, he commits or attempts to commit a felony which has a natural tendency to cause death.

It follows, therefore, that the instructions now under review properly state a settled principle prevailing in the law of homicide.

We have considered the other assignments of error with extreme care, and have reached the deliberate conclusion that none of them can be sustained. We omit further discussion, however, for the reason that the remaining exceptions merely relate to the application of established legal rules to the case at bar.

The prisoner was unable to retain counsel on account of his poverty, and the attorneys who defended him were assigned that important task by the court. We deem it not amiss to observe in closing that they have performed their duty in the premises in accord with the highest tradition of their profession.

The trial and the judgment will be upheld for there is in law

No error.