## STATE v. JOHNNIE D. KNIGHT, JR.

(Filed 21 May, 1958.)

### 1. Homicide § 25—

The evidence in this case tending to show that defendant brutally assaulted his victim in an attempt to commit the crime of rape, inflicting wounds causing death, *is held* sufficient to be submitted to the jury on the issue of defendant's guilt of murder in the first degree.

### 2. Kidnapping § 1—

Evidence tending to show that after defendant had brutally assaulted his victim, he removed her from her home while she was in a dying condition and hid her body in a wood, in an attempt to cover up and blot out the evidence of his crime, is insufficient to show a taking and carrying away of the deceased as an element of the crime of kidnapping, even though she was still alive when he took her out of the car in the woods.

### 3. Homicide § 27c—

Where the evidence is sufficient to be submitted to the jury on the theory of defendant's guilt of murdering his victim in an attempt to commit the crime of rape, but is insufficient to show defendant's guilt of the crime of kidnapping, an instruction that defendant would be guilty of murder in the first degree if the jury should find that the murder was perpetrated in the attempt to commit the crime of rape or in the commission of the felony of kidnapping, must be held prejudicial as permitting the jury to rest its verdict on a theory not supported by the evidence.

### 4. Criminal Law §160—

Where the court submits the question of defendant's guilt on one theory supported by the evidence and also on another theory which is not supported by the evidence, and it is impossible to ascertain whether the verdict of the jury rested on the unsupported theory, a new trial must be awarded.

### 5. Criminal Law § 154—

On appeal from conviction of a capital felony, the Supreme Court will take cognizance *ex mero motu* of prejudicial error appearing on the record even though such error is not assigned by defendant.

### 6. Homicide § 27h— Evidence held to require submission of question of defendant's guilt of murder in the second degree.

The State's evidence tended to show that defendant, who was deaf and dumb, entered a house in which a woman was alone, wrote a proposal

of sexual intercourse on a note, that she became scared, tried to make him leave and hit him, and that thereupon he brutally and fatally assaulted her, but did not try to have intercourse with her. *Held:* While the evidence is sufficient to support the theory of murder committed in the attempted perpetration of the felony of rape, it also supports the inference that defendant did not intend to commit rape but sought to have intercourse with his victim on a voluntary basis, and that his assault upon her was precipitated when she struck at him while she was trying to drive him from the house, and therefore it is the duty of the court upon such evidence to submit the question of defendant's guilt of murder in the second degree, in addition to the question of defendant's guilt of murder in the first degree, or not guilty.

**7. Criminal Law § 109—**

If there is any evidence or if any inference can be fairly deduced therefrom tending to show defendant's guilt of a less degree of the crime charged, it is the duty of the court, under appropriate instructions, to submit that view to the jury.

PARKER, J., concurs in result.

APPEAL by defendant from *Bundy, J.,* and a jury, at August Term, 1957, of NASH.

Criminal prosecution upon a bill of indictment charging the defendant with the murder of Mrs. Myra Brown Manning.

The jury returned a verdict of guilty of murder in the first degree, without recommendation of life imprisonment. Judgment was pronounced imposing the death sentence, from which the defendant appeals, assigning errors.

*Attorney General Patton and Assistant Attorney General Moody for the State.*

*W. O. Rosser and W. O. Warner for the defendant, appellant.*

JOHNSON, J. The first assignment of error challenges the trial court's ruling in denying the defendant's motion for judgment as of nonsuit as to the charge of first degree murder. The assignment brings into focus the evidence on which the State relies. It is summarized in pertinent part as follows:

The deceased, Myra Brown Manning, aged 43, lived with her husband and two sons just beyond the corporate limits of the Town of Bailey in Nash County. The defendant, Johnnie D. Knight, Jr., is a deaf and dumb Negro, who worked at various odd jobs in the vicinity of Bailey. His age is not shown, but he is referred to as a man. He went to school from 1939 to 1946 and reached the sixth grade. One of the defendant's odd jobs was feeding hogs for Unus Peel in a pasture located a short distance back of the Manning home.

Mrs. Manning's husband worked for Farmer Brothers, whose place of business was about a mile from the Manning Home. She usually went for him in the family car when work was over in the afternoon, but on the afternoon of 5 March, 1957, she did not go for him. At about 5:40 p. m. Rayborn Manning, her son, arrived home and found the car was not there. In the house he found signs of an apparent struggle: his mother's glasses were lying on the table. Shoe marks were on the floor, marks were on the wall, and the rug in the bedroom was turned sideways. Her shoes were there, but were "a little ways apart." The bedspread was turned back, and what appeared to be black knee prints were on the bed, and his mother's hair net was lying on the bed. A piece of note paper, balled up, was lying on the corner of the bedspread. Rayborn left the house and located his father at a nearby store. They went to the home of Mrs. Manning's sister. The car was not there, so they returned home after calling peace officers. The husband and the officers described in detail the signs they found in the Manning home. They testified to the same conditions found earlier by the son and, in addition, that bloodstains were seen at various places and that the fire poker was in the wood box upside down with indications it had been used as a weapon. The family car was gone from the back yard. Searching parties were organized and went out from the home. Later that night the dead body of Mrs. Manning was found near the town dump heap, some 25 or 30 yards beyond where the car was stuck in the mud on the side of a dirt road. Mrs. Manning's body showed she had been cut, beaten, mutilated and killed in a shocking manner.

A large work-shoe track was found near Mrs. Manning's body. The witness Jack Griffin measured the width and length of the track. The heel appeared to have left the imprint of the brand of the shoe. Next morning, when Johnnie Knight went down to feed the hogs back of the Manning home, Griffin saw him and after he left went out and measured his tracks and found they had the same measurements and brand imprint as the track found near the body of Mrs. Manning.

Later in the day, the defendant was taken into custody by Sheriff Womble. He was taken to the Bailey Police Department. In his pocket were found a hawkbill knife with blood on it, a pencil and notebook, and some cards on which were pictures of naked white women. That night (6 March, 1957), in the city jail in Rocky Mount Sheriff Womble and S. B. I. Agent Wilson examined the defendant by the method of having him write notes in the form of answers to written questions. The defendant was examined again by the same method on 12 March, 1957. Each time he confessed killing Mrs. Manning.

The evidence discloses that both confessions were made under circumstances rendering them competent and admissible, and justifying

the inference that they were voluntarily made under application of rules applied in numerous decisions of this Court. See *S. v. Rogers,* 233 N.C. 390, 64 S.E. 2d 572; *S. v. Whitener,* 191 N.C. 659, 132 S.E. 603. Two confessions later made by the defendant were excluded, for failure to show to the satisfaction of the court that they were voluntarily made.

In his confessions of 6 and 12 March the defendant stated in part: that he knew Mrs. Manning was alone in the house; that he knocked on the front door and got into the house; that he went there "to try to f... her"; that by means of a written note—the one found on the bedspread—he made a proposal of sexual intercourse to Mrs. Manning; that she got scared and tried to make him leave the house; that he struck her with the fire poker and also cut her throat with his knife, and then wrapped a towel around her neck and put her in the Manning family car parked behind the house; that he drove the car out to the place where it was found near the town dump heap, pulled Mrs. Manning out, and left her in the woods about 50 feet beyond the car, where she was later found; that she was not dead when he took her out of the car. The defendant later went with the officers and pointed out where he left the car, showed them how he pulled Mrs. Manning out of the car, pointed out a spot of blood on the ground where the body had been found, and found for them in a nearby cornfield a piece of towel with bloodstains on it.

Dr. John Chamblee, who examined the body to determine the cause of death, testified in part as follows:

"The first finding on the head was a deep cut on the back left side of the head which was approximately 2½ inches long and went through all of the layers of the skull down to the bone. . . . It was a ragged type of wound. In my opinion that wound was made from a blow by a blunt instrument rather than a cut from a sharp instrument. . . . It (referring to throat wounds shown on a photograph) shows a gaping wound in the center of the throat just below the level of the voice box. That wound entered into the windpipe, cut into the windpipe. . . . A number of cuts and bruises were also found on the body and on the throat there were several light cuts. They were through the skin but did not go deeper than the skin. They were criss-crossed across her throat about three of them approximately six inches long, . . . Also on the left side of the throat at the lower part of the throat there was a stab type wound. . . . Also there was a large bruise on the left side of the jaw. . . . There was a bruise across the bridge of the nose, a big bruise surrounding the right eye, a smaller bruise at the corner of the left eye, and there were three bruises on the outer surface of the left forearm. There was a large bruise on the right shoulder,

. . . There were two bruises on the inner surface of the right thigh approximately the size of a silver dollar, . . . On examination of the left hand there was a deep cut across the fingers that was to the bone on the index and middle finger. . . . There was a deep cut between the thumb and the index finger into the palm of the hand on the fatty part of the palm next to the thumb and there were several light cuts across the palm of the hand. They were not clean through the skin but they were shallow cuts made, in my opinion, with a sharp instrument. Coming back to the largest wound in the center of the throat, . . . it was kind of a rounded wound like someone had cored it out. The wound was open. . . . I examined her to see whether she had been raped and my examination and lab tests ruled out rape. In my opinion Mrs. Manning's death was caused from loss of blood from the cuts on her throat and the cuts on the back of her head. She bled to death." Dr. Chamblee further testified that the cut wounds "could have been made with an instrument like" the defendant's knife which was offered in evidence; and that "the blow on her head could have been produced by such an instrument as" the fire poker exhibited to the witness.

It is manifest that the State's evidence was sufficient to carry the case to the jury on the issue of murder in the first degree and to justify the inference that the deceased was killed by the defendant in the attempt to perpetrate the felony of rape. The motion for judgment as of nonsuit was properly overruled.

However, a new trial must be awarded for errors in the charge. The record discloses that the trial Judge instructed the jury that it should return one of three verdicts, to wit: (1) guilty of murder in the first degree as charged in the bill of indictment; (2) guilty of murder in the first degree with recommendation that the punishment be imprisonment for life in the State's Prison; or (3) not guilty.

The presiding Judge, being of the opinion that all the evidence on which the State relied tended to show a murder committed in the perpetration or attempted perpetration of either the felony of rape or of kidnapping, submitted the case to the jury under the felony-murder statute, G.S. 14-17, which provides in part as follows: "A murder . . . which shall be committed in the perpetration or attempt to perpetrate any arson, *rape,* robbery, burglary *or other felony,* shall be deemed to be murder in the first degree. . . ." (Italics added.)

The jury was instructed that depending on how it found the facts to be from the evidence, under application of the law as given the jury by the court, it could find the defendant guilty of murder in the first degree upon the ground that he killed the deceased in the perpetration or attempt to perpetrate either or both of the crimes of rape or kid-

napping. As previously noted, the evidence was clearly sufficient to carry the case to the jury on the issue of murder committed in the attempted perpetration of the crime of rape. However, we are constrained to the view that the evidence does not justify the inference that the killing was committed in the perpetration or attemped perpetration of the felony of kidnapping. True, the defendant stated in his confession that the deceased was still alive when he took her out of the house and that she was also alive when he pulled her out of the car near the dump heap. It is further noted that he stated in his confession that he killed her in the "wood," meaning where he left her near the dump heap. But the record is silent as to what additional blows, if any, the defendant struck the deceased after taking her mutilated body out of the car in the woods. And all the evidence of substance *on which the State relies* tends to show the defendant attempted to force the deceased to have sexual intercourse with him and that while she was defending herself and trying to drive him from her home, she was subjected to a murderous assault with a fire poker and a hawk-bill knife, and that she was in a dying condition when the defendant took her from the house. The doctor who later examined the body, after describing deep cut wounds on her head and about her throat, said she bled to death. In his confession the defendant stated that he hit her with the poker and cut her at the house. The gash wound on the back of her head, which the State contends was administered with the fire poker, went through to the skull bone. Signs of loss of much blood were found in the house. The defendant in his confession said he tried to mop it up with towels before taking her out of the house. And the evidence discloses that in the back seat of the car where she was placed by the defendant it "was bloody all over inside . . . just like you had . . . sprayed the whole automobile."

The evidence relating to the defendant's acts and conduct in carrying the deceased from her home and hiding her in the woods is insufficient to show a taking and carrying away of the deceased as an element of the crime of kidnapping. *S. v. Witherington*, 226 N.C. 211, 37 S.E. 2d 497. See also *S. v. Streeton*, 231 N.C. 301, 56 S.E. 2d 649. On the contrary, the reasonable inference deducible from this phase of the evidence is that the defendant in removing the deceased from the home was trying to cover up and blot out the evidence of his murderous assault and attempt at rape. It thus appears that the instruction as given by the trial Judge permitted the jury to rest its verdict on a theory not supported by the evidence, namely that of kidnapping. We have no way of knowing whether the jury did or did not rest its verdict on the theory of kidnapping. Therefore, since the instruction was calculated to prejudice, and may have prejudiced,

the defendant, it must be held for error. See *S. v. Alston*, 228 N.C. 555, 46 S.E. 2d 567; 24 C.J.S., Criminal Law, Sec. 1922, pp. 1019 and ,1020; 41 C.J.S., Homicide, Sec. 427a, pp. 287 and 288. While the error is not assigned by the defendant, nevertheless, since we are here dealing with a capital case, we take cognizance of the error *ex mero motu.* In *S. v. McCoy*, 236 N.C. 121, 71 S.E. 2d 921, this Court, speaking through Valentine, J., said: "In this enlightened age the humanity of the law is such that no man shall suffer death as a penalty for crime, except upon conviction in a trial free from substantial error and in which the constitutional and statutory safeguards for the protection of his rights have been scrupulously observed. Therefore, in all capital cases reaching this Court, it is the settled policy to examine the record for the ascertainment of reversible error. (Citing authorities) If, upon such an examination, error is found, it then becomes the duty of the Court upon its own motion to recognize and act upon the error so found. . . . This rule obtains whether the prisoner be prince or pauper."

Our study of the record also brings into focus a phase of the evidence which seems to require further consideration of the Judge's charge to the jury. In the defendant's confession we find he made statements inconsistent with those relied on by the State to support its theory of murder committed in the attemped perpetration of rape. The statements which are at variance with the rape-murder theory are in substance as follows: that he had known Mrs. Manning about a year; that he had been to her house before; that he went to the door on this occasion, knocked, and was admitted. After getting inside, he said he wrote the note making the proposal of sexual intercourse; that the note was written on the notebook pad he had in his pocket; that in this manner he said "he asked her for some"; that she said "no," and tried to hit him; that he then cut her. He further said he did not try to have sexual relations with Mrs. Manning. While the greater volume of the confession-testimony may tend to support the State's theory of murder committed in the attempted perpetration of the felony of rape, nevertheless the foregoing line of testimony, if believed, is sufficient to support the inference that the defendant had no intent to rape Mrs. Manning but sought only to have intercourse with her on a voluntary basis, and that his assault upon her was precipitated when she struck at him while she was trying to drive him from the house. We are constrained to the view that this line of evidence, when tested by authoritative decisions of this Court, required that the jury be permitted to consider a lesser degree of homicide than murder in the first degree.

STATE *v.* KNIGHT.

It is true, as the State contends in its brief, that it is rarely the case where the felony-murder statute, G.S. 14-17, applies that the jury should be permitted to consider a lesser degree of homicide than murder in the first degree. "If, however, there is any evidence or if any inference can be fairly deduced therefrom, tending to show one of the lower grades of murder, it is then the duty of the trial court, under appropriate instructions, to submit that view to the jury." *S. v. Spivey,* 151 N.C. 676, 686, 65 S.E. 995; *S. v. Miller,* 219 N.C. 514, 14 S.E. 2d 522; *S. v. Perry,* 209 N.C. 604, 184 S.E. 545. See also *S. v. Streeton, supra* (231 N.C. 301).

We conclude that the foregoing evidence, and other testimony of a corroboratory nature, was sufficient to justify, though not require, the inference of a lower degree of homicide than murder in the first degree, namely, murder in the second degree, and that the trial court erred in not so instructing the jury.

For the errors pointed out the defendant is entitled to a new trial. It is so ordered.

New Trial.

PARKER, J., concurs in result.