STATE OF NORTH CAROLINA v. DON MICHAEL WOODS, JR.

No. 485A85

(Filed 2 April 1986)

1. **Constitutional Law § 63; Jury § 7.11— death qualification of jury—constitutionality**

    The trial court did not err in allowing the State to death qualify the jury under N.C.G.S. § 15A-2000(a)(2) and in allowing challenges for cause of jurors opposed to the death penalty.

2. **Homicide § 32.1— failure to submit involuntary manslaughter—error cured by felony murder conviction**

    Assuming arguendo that the trial judge in a first degree murder prosecution erred in failing to instruct on involuntary manslaughter, the error was harmless because the jury specifically found that the underlying felony of kidnapping was committed, which supports defendant's conviction of first degree murder on the basis of felony murder. N.C.G.S. § 15A-1443(a).

APPEAL by defendant from judgment entered by *Preston, J.,* at the 1 April 1985 session of Superior Court, HOKE County. Defendant was convicted of murder in the first degree and kidnapping in the first degree. From the judgment of life imprisonment, defendant appeals as a matter of right pursuant to N.C.G.S. § 7A-27(a). Heard in the Supreme Court 10 February 1986.

*Lacy H. Thornburg, Attorney General, by Charles H. Hobgood, Assistant Attorney General, for the state.*

*Paul F. Herzog, Assistant Public Defender, Twelfth Judicial District, for defendant.*

MARTIN, Justice.

The state presented evidence tending to show the following:

Defendant, Don Woods, and his wife, Isabelle Woods, had been living separate and apart for several months. On Labor Day weekend 1984, fifteen-year-old Michael Woods took the school bus to his father's residence to spend the weekend with him. Defendant drank throughout Friday night and Saturday and carried a .357 magnum handgun about the house. Because defendant's drinking had been increasing steadily during the weekend, Michael went into defendant's bedroom on Sunday morning while defendant was still asleep, took the gun from defendant's dresser, and hid it under a fan on the wood heater. After going to church, Michael went home with his mother.

Michael then realized he had left his running clothes and shoes at his father's house. He asked his mother if they could go by defendant's to get his clothes, but she replied they would have to wait until early Monday morning when hopefully defendant wouldn't be drinking. At about 10:00 a.m. Monday, Michael and his mother arrived at defendant's house. They went inside, to find no one at home. Michael went into his room to get his clothes and began playing his stereo. Defendant came in the house drinking a beer. When Michael came out of his room and asked if he could return a shirt to his cousin, defendant inquired as to the whereabouts of his gun and told Michael to get it for him. Michael did so. Because defendant had a gun, Isabelle Woods said she would drive Michael to his cousin's, but defendant said he would give the gun to Michael if Isabelle would stay at the house. Michael took the gun with him and ran his errand. When he returned, he left the gun in the car. As soon as Michael entered the house, defendant asked where his gun was. Michael got the gun and gave it to defendant.

About thirty minutes later, Michael went into the den and heard his father tell his mother that she might as well get ready because her time had come. Mrs. Woods, crying, got up and walked towards the door saying, "I'd rather you . . . kill me running than for me to just sit here and take it like this." Defendant replied, "Walk out the door and I will show you," grabbed his gun, and turned towards her. She shut the door and sat down.

Later, defendant and Mrs. Woods went into defendant's bedroom where they stayed for thirty to forty minutes. Defendant came out and sent Michael to the store for beer, saying he

and his mother could leave when he got back. The doors to the house were locked when Michael returned and defendant let him in. However, when Mrs. Woods asked defendant if they could leave, defendant told her they weren't going anywhere and he closed and locked the doors. Defendant began drinking and once more Mrs. Woods told defendant if he was going to kill her she'd rather he kill her running. Again defendant threatened her if she walked out the door, and Mrs. Woods did not leave.

Defendant and Mrs. Woods went into the living room and defendant left his gun in the den. Michael took the gun, unloaded it, hid the six cartridges under a pillow, and replaced the gun on the coffee table.

About thirty minutes later, defendant and Mrs. Woods came into the den. Shortly thereafter defendant asked Michael to get him paper and a pen. He then told his son, "Write what I tell you to write." For his father, Michael wrote:

> Pop Woods and Mom
>
> Love is something a person can't explain. I love you Pop & Mom. Hope yal forgive me. I couldn't help it. Mom loves you. She always will. Please be good. Straighten up. I'm so sorry.

Pop Woods is defendant's youngest son. Then defendant added in his own hand.

> Pop   Mom & Dad
>
> love you
>
>> Mom I. love you
>> to I am so sorry
>> I couldn't help it
>
> Love yal
>
> Don M Woods

Defendant attempted to get Mrs. Woods to sign the note, but she refused. Defendant then told Michael to leave. Both Michael and his mother were crying, and she begged him not to go. As Michael left, he heard his mother begging defendant not to kill her. Michael went down the driveway, but his parents came to

the door and waved him back. When Michael got to the porch, defendant, with the gun in his hand, told Michael to kiss his mother and him goodbye. Michael left and went to get his cousin, who drove Michael to the sheriff's department.

When Michael and the officers arrived at the house, Michael checked the doors, all of which were locked. As the officers approached the house, defendant came down a dirt road and asked them if they'd been in and said, "She's hurt bad." After Michael got his keys, the officers entered the house.

The officers found defendant's .357 magnum in defendant's bedroom in a fully cocked position. The gun must be cocked before it can be fired. The gun contained one spent cartridge and three live rounds. The officers then discovered the body of Isabelle Woods in the den, sprawled backwards on the hearth. Her upper body was naked and her shorts and panties were pulled down to mid-thigh. The note dictated to Michael by defendant was found on the hearth. A chair had been placed against the locked door leading from the den to outside. Detectives found the six bullets which Michael had removed from the gun under the pillow where he had hidden them.

Medical evidence established that Isabelle Woods died as a result of a gunshot wound to the right shoulder. The medical examiner testified that the lead slug, fired from a distance of one and a half to two feet away, travelled at a downward angle from front to back, passed through her clavicle, continued through her second rib, passed through her lung, and ended up in her aorta where it tore a hole. Autopsy further revealed that Mrs. Woods had swallowed a large amount of blood, which indicated that she lived for several minutes after she was shot. Sperm was found in her vagina. No gunshot residue was discovered on the victim's hands; however, such residue was found on the backs and palms of defendant's hands. After being transported to the jail and advised of his constitutional rights, officers asked him what happened. He said, "Yes, I did it. We were starting to make love and she grabbed for the gun and I grabbed it at the same time and the gun went off. The gun went off when the blue car started pulling in the drive and the brown car was behind it." He then stated that he ran through the house and jumped out the back

window as the officers' cars pulled up at the house, and commented that the officers should have heard the gun go off.

Defendant presented no evidence at trial.

[1] Defendant raises two issues for our consideration. By his first assignment of error, defendant contends that the trial court erred in allowing the state to death qualify the jury under N.C.G.S. § 15A-2000(a)(2) and in allowing the challenges for cause of jurors opposed to the death penalty, alleging that such procedures violate the Federal and North Carolina Constitutions. Although the defendant filed a motion to limit disqualification of the jurors, he failed to present evidence in support of the motion. As defendant notes, this issue was decided against him in *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803 (1980), and as we said in *State v. Peacock*, 313 N.C. 554, 330 S.E. 2d 190 (1985), we decline to reconsider our holdings on this matter.

[2] Second, defendant asserts that the trial court committed plain error by failing to instruct the jury on the lesser included offense of involuntary manslaughter. *State v. Odom*, 307 N.C. 655, 300 S.E. 2d 375 (1983). He relies upon *Peacock*. Although *Peacock* is not based upon a "plain error" analysis, it does hold that a trial judge is required "to charge upon a lesser included offense, even absent a special request, where there is evidence to support it." 313 N.C. at 558, 330 S.E. 2d at 193.

We note that the trial judge submitted to the jury possible verdicts of murder in the first degree, murder in the second degree, voluntary manslaughter, and not guilty, and he also charged the jury on the theory of accident. Assuming arguendo that the trial judge erred in failing to instruct on involuntary manslaughter, we find the error harmless under N.C.G.S. § 15A-1443(a) because the jury specifically found that the underlying felony of kidnapping was committed, which supports defendant's conviction of murder in the first degree on the basis of felony murder. It is well established that "[t]he killing of another human being, whether intentional or otherwise, while the person who kills is engaged in the perpetration of a felony, which felony is inherently or foreseeably dangerous to human life, is murder . . . ." *State v. Shrader*, 290 N.C. 253, 261, 225 S.E. 2d 522, 528 (1976). *See also State v. Thompson*, 280 N.C. 202, 185 S.E. 2d 666 (1972); *State v. Streeton*, 231 N.C. 301, 56 S.E. 2d 649 (1949). Kid-

napping is such a felony. *Streeton*, 231 N.C. 301, 56 S.E. 2d 649; N.C.G.S. § 14-17 (1981).

Defendant, anticipating our finding, argues in his brief that just as intent to kill is irrelevant in felony murder, so such intent to kill is irrelevant for a conviction of involuntary manslaughter. He insists that "[t]he trial court should have given the jury the option of finding defendant guilty of another killing where intent was irrelevant," *i.e.*, involuntary manslaughter. He asserts that the facts could support a finding that Isabelle Woods voluntarily remained with defendant, intending, as defendant claimed, to make love to her husband, and that the jury could have found defendant guilty of kidnapping and involuntary manslaughter. We find such reasoning to be intrinsically inconsistent and unpersuasive.

First, the jury returned a verdict of guilty of kidnapping in the first degree, the indictment for which required a finding that defendant unlawfully, willfully, and feloniously confined Isabelle Woods *without her consent* for the purpose of terrorizing her. Thus there is no merit to defendant's argument that the jury could have found that Mrs. Woods voluntarily stayed with defendant yet found him guilty of both kidnapping and involuntary manslaughter. Second, death caused by the unintentional discharge of a gun in the hands of a felon engaged in the perpetration of a felony within the meaning of N.C.G.S. § 14-17 is murder in the first degree. *State v. Thompson*, 280 N.C. 202, 185 S.E. 2d 666. The record is devoid of evidence which might convince a rational trier of fact to convict defendant of involuntary manslaughter. *State v. Wright*, 304 N.C. 349, 283 S.E. 2d 502 (1981). We thus overrule defendant's second assignment of error.

Defendant received a fair trial, free of prejudicial error.

No error.